United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 13, 2007**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

————————————————

No. 05-51418

————————————————

DAVID DISRAELI,

Plaintiff - Appellant,

versus

JOSEPH JASON ROTUNDA; DAVID ANDREW GRAUER; JOHN ROBERT MORGAN;
JOHN DOE, 1; JOHN DOE, 2; JOHN DOE, 3; JOHN DOE, 4; JOHN DOE, 5

Defendants - Appellees.

————————————————————————————————

Appeal from the United States District Court
for the Western District of Texas

————————————————————————————————

Before KING, WIENER, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

David Disraeli ("Disraeli"), appearing pro se, appeals the district court's judgment dismissing his complaint filed pursuant to 42 U.S.C. § 1983. In his original complaint, Disraeli named Joseph Rotunda ("Rotunda"), David Grauer ("Grauer"), and John Morgan ("Morgan") as defendants. He later amended his complaint to add five John Does ("the Does") as additional defendants. Disraeli never amended his complaint to more specifically identify the Does. The district court found that all three named defendants are entitled to absolute immunity from civil liability in connection with their

duties as government officials and that Disraeli failed to prosecute his claims against the Does. Disraeli appeals this ruling.

## I. FACTS AND PROCEEDINGS

In October 2002, Rotunda, an enforcement attorney with the Texas State Securities Board ("the Board"), observed an advertisement for an investment opportunity placed by Disraeli in the Austin American Statesman. Rotunda suspected that the advertisement indicated possible violations of Texas's securities laws. Rotunda then began an investigation of Disraeli and concluded that Disraeli might be misrepresenting himself as a licensed investment adviser, when in fact he was not. Rotunda also discovered that the advertised investment opportunity was neither registered nor permitted for sale in Texas. When Rotunda contacted Disraeli in the course of the investigation, Disraeli represented that he had not sent any materials relating to the investment to any potential investors, though Rotunda knew the opposite to be true. Consequently, Rotunda concluded that Disraeli was actively misrepresenting the nature of the investment. Rotunda presented his findings and conclusions to Grauer, the director of the enforcement division of the Board, who agreed with Rotunda that "an Enforcement Cease and Desist Order was necessary to protect the public." Grauer and Rotunda drafted an order and presented it to Morgan, the acting Securities Commissioner at the time, who agreed that such an order was necessary. On November 10, 2003, Morgan signed and executed the Emergency Cease and Desist Order ("emergency order"), ordering Disraeli to immediately cease and desist from offering the securities at issue in the investigation in Texas until the securities could be registered, using misleading or fraudulent offers in connection with the securities, and rendering services as an investment adviser without a license to do so. *See* TEX. REV. CIV. STAT. ANN. art. 581-22 (establishing statutory requirements for advertising securities). The

2

order notified Disraeli of his right to request a hearing from the Securities Commissioner. Disraeli ultimately waived his right to a hearing and consented to entry of a Cease and Desist Order ("consent order") that prohibited the same activities named and prohibited in the emergency order.

On November 5, 2004, Disraeli filed suit under 42 U.S.C. §§ 1983 and 1985(3), as well as 28 U.S.C. § 2201, alleging that Rotunda, Grauer, and Morgan were liable for violating his right to due process by issuing the emergency order. He further asserted that the defendants violated federal trademark law by publishing his name in a disparaging manner without his consent. Defendants asserted absolute immunity from suit and moved to dismiss under Rule 12(b)(6); the district court converted their motion into one for summary judgment under Rule 56. The district court ordered limited discovery on the question of defendants' actions with respect to the emergency order. Following discovery, defendants moved formally for summary judgment, again asserting that they were entitled to absolute immunity or, in the alternative, qualified immunity. The magistrate judge recommended dismissing Disraeli's claims and the district court did so, specifically finding that the named defendants "are entitled to absolute immunity in this cause," that the defendants were within their jurisdiction to issue the emergency order, and that Disraeli had abandoned his claims against the John Does. Disraeli now appeals this decision.

## II. DISCUSSION

### A.        Standard of Review

We review a district court's grant or denial of summary judgment de novo, applying the same standard as the district court. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

3

any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Any reasonable inferences are to be drawn in favor of the non-moving party. *Gowesky*, 321 F.3d at 507.

If a party moves for summary judgment and asserts a defense of absolute or qualified immunity in good faith, the burden shifts to the other party to rebut it. *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633–34 (5th Cir. 2000). The movant can support its motion by relying on the pleadings alone. *Id*. at 634.

## B. Absolute Immunity

Absolute immunity denies all remedies to an individual, like Disraeli, who asserts that his rights have been violated. *O'Neal v. Miss. Bd. of Nursing*, 113 F.3d 62, 65 (5th Cir. 1997). Consequently, the Supreme Court has been "quite sparing" in broadening its scope. *Id*. (quoting *Forrester v. White*, 484 U.S. 219, 224 (1988)). Judges and prosecutors are generally entitled to absolute immunity. *Beck*, 204 F.3d at 634. Absolute immunity is also available to certain quasi-judicial officers and agencies. *Butz v. Economou*, 438 U.S. 478, 512 (1978); *Beck*, 204 F.3d at 634 (noting that immunity may extend to state agencies as well). Agency officials "performing certain functions analogous to those of a prosecutor" are immune from civil liability resulting from such acts. *Butz*, 438 U.S. at 515. This court applies a "nonexhaustive list" of factors from *Butz* to determine whether an administrative employee or agency is entitled to absolute immunity:

(1) the need to assure that the individual can perform his functions without harassment or intimidation;
(2) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct;
(3) insulation from political influence;
(4) the importance of precedent;
(5) the adversary nature of the process; and

4

(6) the correctability of error on appeal.

*Beck*, 204 F.3d at 634 (*citing Butz*, 438 U.S. at 512). No one factor is controlling. *Id.* Applying these factors, this court has found that members of a state nursing board, *O'Neal*, 113 F.3d at 67, members of a state dental board, *Beck*, 204 F.3d at 636, and members of the disciplinary board of the National Association of Securities Dealers, *Austin Mun. Secs., Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 757 F.2d 676, 679 (5th Cir. 1985), are entitled to absolute immunity from suit in the performance of their quasi-judicial functions. In *Beck*, the court held that while the board was entitled to absolute immunity, an investigator employed by the board was not, as he "performed investigative, not adjudicative nor prosecutorial functions." *Beck*, 204 F.3d at 636. The *Beck* court pointed out that the investigator "neither initiated nor pursued prosecution of the complaint" against the plaintiff, and his work was thus "not at the heart of the adjudicative process." *Id.* at 637.

## C.     Applying *Butz*

Disraeli primarily challenges the issuance of the emergency order, which he contends "acted as a de facto disbarment." He asserts that because of the nature of the process by which an emergency order is issued, the defendants should not be protected by absolute immunity.

It is clear from the facts that the actions of the three named defendants in drafting and issuing the emergency order were prosecutorial or adjudicative in nature and were "at the heart of the adjudicative process" established by the Texas State Securities Board. *See Beck*, 204 F.3d at 637. More specifically, by applying the *Butz* factors we hold that the district court correctly granted absolute immunity to the defendants.

1.	**Need to protect against harassment or intimidation**

Disraeli concedes that "both Rotunda and Grauer must be free from harassment or intimidation to carry out their duties." We agree and point out that the attorneys here perform a disciplinary function in their work for the Board, which this court has noted makes individuals "likely targets for suit." *Austin Mun. Secs.*, 757 F.2d at 689; *see also O'Neal*, 113 F.3d at 66. The Texas Securities Commissioner is charged with "tak[ing] such measures and [making] such investigations as will prevent or detect the violation of any provision" of Texas's securities laws. TEX. REV. CIV. STAT. ANN. art. 581-3. Further, the Commissioner must present any evidence of wrongdoing to the proper District or County Attorney. *Id*. Here, the defendants' actions were all in furtherance of these statutory duties, which by their nature are both prosecutorial and likely to arouse the ire of targeted individuals.

2.	**The presence of safeguards that reduce the need for private damages**

Disraeli asserts that because the Board can issue an emergency order without any preceding process, there is an absence of safeguards to protect against violations of constitutional rights before any reputational damage is done. In *Austin Municipal Securities*, we examined a similar argument; plaintiffs alleged that the administrative appeals process by which a securities dealer might vindicate itself in a disciplinary proceeding would "not rectify the expense and injury to one's reputation incurred by having to defend against improper prosecution." 757 F.2d at 690. We rejected that argument, stating plainly that "this hazard is precisely the same as would be faced in any other judicial or administrative proceeding of a regulatory nature." *Id*. The logic of *Austin Municipal Securities* applies here with greater force, as the emergency order is a necessary tool for protecting the public from fraudulent or misleading investments. Our system of justice would not long tolerate lawsuits

6

against prosecutors based on the damage inflicted by initial injunctive steps taken to prevent further illegal activity.

Further, any party aggrieved by a decision of the Commissioner is entitled to a hearing, at which it may be represented by counsel and present evidence. TEX. REV. CIV. STAT. ANN. art. 581-24; TEX. GOV'T CODE ANN. § 2001.051, 2001.053. Any adverse decision must be in writing or stated on the record, and any findings of fact must be supported by evidence presented at the hearing. TEX. GOV'T CODE ANN. § 2001.141. Should an aggrieved party wish to appeal the outcome of the hearing, it may file a petition with the state district court. TEX. GOV'T CODE ANN. § 2001.171. Consequently, there are sufficient safeguards limiting the discretion of the Securities Commissioner such that private damages are not necessary to protect against capricious enforcement.

## 3. Insulation from political influence

Much like the members of the nursing board found to be "shielded" from political influence in *O'Neal*, the five members of the State Securities Board are shielded from political influence because they are appointed to staggered six-year terms by the governor. *O'Neal*, 113 F.3d at 66; TEX. REV. CIV. STAT. ANN. art. 581-2(A). The Board appoints a Securities Commissioner who serves at its pleasure. TEX. REV. CIV. STAT. ANN. art. 581-2(G). The Securities Commissioner is, in turn, empowered to appoint "other persons as necessary to carry out the powers and duties of the Commissioner under this Act." TEX. REV. CIV. STAT. ANN. art. 581-2(H). As the acting Securities Commissioner, Morgan was sufficiently shielded from political influence to allay fears that he might use his power to carry out politically motivated prosecutions. As his employees, Rotunda and Grauer were similarly shielded. This factor thus weighs in favor of finding all three defendants immune.

7

**4.      The importance of precedent**

Disraeli does not present any arguments about whether the Board was bound by or followed its own precedent. In any event, there is no reason for the court to conclude that the Board would be unlikely to follow its own precedent.

**5.      The adversarial nature of the process**

Disraeli asserts that because the emergency order could be issued without a hearing, that portion of the process is not adversarial. While this is true, it does not make the proceedings less judicial in nature. State and federal courts routinely issue temporary restraining orders without a hearing — the ability to do so lies at the core of a court's ability to carry out its duties. Here, Disraeli does not deny that the remaining portion of the process would have been adversarial. Though Disraeli focuses on a necessarily non-adversarial stage of the process, which can be challenged and appealed at subsequent stages, the overall agency action is judicial in nature.

**6.      The correctability of error on appeal**

As noted above, Disraeli could have sought correction of any order entered by the Commissioner on review to the state courts of Texas. He chose not to avail himself of the protections afforded by this system and instead signed the consent order.

**D.      The defendants' actions**

The following recapitulation of each defendant's actions shows why they are entitled to immunity for their roles in the issuance of the emergency order and the preceding investigation.

**(1)      Morgan**

Morgan's role was limited to reviewing and signing the emergency order drafted by Rotunda and Grauer. Morgan reviewed the evidence presented to him and determined that it supported a

finding that Disraeli was in violation of Texas securities law. He took no part in the gathering of facts supporting this decision. Disraeli asserts that Morgan is "not a judge," but this argument misses the fact that quasi-judicial authority is sufficient to confer immunity upon state officials who "make findings of fact and assess punishments or accolades in accordance with these findings." *O'Neal*, 113 F.3d at 66.

**(2)     Grauer**

Grauer's role was entirely supervisory. As director of the Board's Enforcement Division, Grauer's primary responsibility was enforcement of Texas's securities laws, which included overseeing the actions of the attorneys working under him. Grauer's actions in evaluating the facts presented by Rotunda and determining what action to take were virtually identical to those of a district attorney who is presented with evidence of a crime and must decide how to protect the public. By preparing the emergency order for Morgan to sign, Grauer took the first step toward stopping Disraeli's actions. Had the case proceeded to an administrative hearing, Grauer, along with Rotunda, would have been responsible for presenting evidence at the hearing and otherwise prosecuting the case. There is no doubt that all of Grauer's actions were "analogous to those of a prosecutor" and thus protected by absolute immunity. *Butz*, 438 U.S. at 515.

**(3)     Rotunda**

As a staff attorney in the Enforcement Division, Rotunda was responsible for detecting, investigating, and preventing any violations of securities law. Disraeli came to Rotunda's attention through an advertisement in the newspaper, which Rotunda reviewed regularly as part of his duties. The advertisement aroused Rotunda's suspicion, and he directed an undercover investigator employed by the Board to contact Disraeli and learn what she could about the investment. The investigator

reported that Disraeli represented himself to be a registered investment adviser, which was false. Rotunda gathered more information about the investment itself and discovered that no permit had been issued to sell the offered securities. Rotunda spoke with Disraeli, who told him that he had not received any money for investment in the advertised securities, nor had he sent any documents to any potential investors. Rotunda knew that the latter assertion was also false.

Rotunda then took the necessary steps to protect the public against Disraeli's acts. Together, he and Grauer determined that an emergency order was necessary, drafted the order, and presented it to Morgan. Rotunda then proceeded to negotiate the terms of the consent order to which Disraeli ultimately agreed. In these later steps, his role was indistinguishable from that of Grauer and was afforded the same protection. Disraeli has seized upon the word "investigation" with regard to Rotunda's initial efforts at verifying whether a crime had indeed been committed and has asserted that these actions should not receive the protection of absolute immunity. Disraeli's second amended complaint does not clearly articulate how, if at all, he was harmed by Rotunda's investigation. The complaint focuses on the issuance of the emergency order as the source of the harm, though it identifies some grievances regarding the course of the investigation and asserts that the investigation should have been both more thorough in parts and less intrusive in others.

Even if we assume that Disraeli has alleged harm caused by Rotunda's efforts at investigating his actions and that Rotunda's investigative efforts are not protected by absolute immunity, Disraeli's claims against Rotunda still fail. This is because Rotunda, like the other two defendants, asserted a defense of qualified immunity in the alternative to absolute immunity.

If a prosecutor engages in activities "akin to those of an administrative or investigative officer, rather than to those of an advocate," the prosecutor is no longer entitled to absolute immunity. *Geter*

10

*v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988). As long as the prosecutor acts within his discretionary authority, however, he is entitled to qualified immunity. *Id*. Rotunda, like Grauer and Morgan, asserted that he was entitled to qualified immunity for any actions the court found were not protected by absolute immunity. Once Rotunda asserted this defense, the burden shifted to Disraeli. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). The district court allowed Disraeli to conduct discovery to address the proffered immunity defenses, but Disraeli's brief in response failed to address qualified immunity in any meaningful way. Disraeli never connected any of Rotunda's investigative acts to an alleged constitutional violation. It is clear from the record that Disraeli failed to carry his burden of rebutting the proffered defense and the district court could have awarded Rotunda qualified immunity on this basis. "It is well-settled . . . that we will not reverse a judgment of the district court if it can be affirmed on any ground, regardless of whether the district court articulated the ground." *United States v. Real Property Located at 14301 Gateway Blvd. West, El Paso County, Texas*, 123 F.3d 312, 313 (5th Cir. 1997). Because the district court could have awarded Rotunda qualified immunity based on the record and briefs before it, we affirm its judgment. *See Brown v. Lyford*, 243 F.3d 185, 191 (5th Cir. 2001) (awarding a defendant qualified immunity though the district court granted him absolute immunity and thus did not address qualified immunity).

**E.      Disraeli's other claims**

Disraeli asserts that the district court made various errors relating to the merits of his claim. Because we affirm the district court's grant of immunity, we need not reach these arguments. Disraeli also contends that he would have amended his petition to name one of the unnamed Does in his amended complaint, but the district court dismissed his claims before he had a chance to do so. On August 5, 2005, Disraeli stated that he would seek leave to amend his complaint to add the name, but

11

by September 13, 2005, he had not done so, and the district court dismissed these claims. Disraeli offers no reason for this delay. We conclude that the district court did not abuse its discretion in ruling that he failed to prosecute his claims against the Does. *See Ramsay v. Bailey*, 531 F.2d 706, 707–08 (5th Cir. 1976).

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court.