RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0026p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ANDREW COOPERRIDER; DEANS DINER, LLC, dba Brewed,

     *Plaintiffs-Appellants,*

   *v.*

MAGGIE WOODS, Malt Beverage Administrator with the Kentucky Department of Alcoholic Beverage Control, ANDREW G. BESHEAR, Governor of Kentucky, RAY A. PERRY, Secretary of Public Protection Cabinet, ALLYSON TAYLOR, Commissioner of the Kentucky Department of Alcoholic Beverage Control, WESLEY WARDEN DUKE, General Counsel for the Kentucky Cabinet for Health and Family Services, and JOSHUA NEWTON, General Counsel for the Kentucky Department of Alcoholic Beverage Control, in their individual and official capacities,

     *Defendants-Appellees.*

No. 24-5351

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:22-cv-00016—Gregory F. Van Tatenhove, District Judge.

Decided and Filed:  February 7, 2025

Before:  MOORE, CLAY, and THAPAR, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Christopher Wiest, Theodore Roberts, CHRIS WIEST, ATTY AT LAW, PLLC, Covington, Kentucky, Thomas B. Bruns, BRUNS, CONNELL, VOLLMAR, ARMSTRONG, Cincinnati, Ohio, for Appellants.  Jan M. West, J. W. Hall, GOLDBERG SIMPSON, LLC, Prospect, Kentucky, for Appellees Maggie Woods and Allyson Taylor.  Laura C. Tipton, Travis Mayo, Taylor Payne, OFFICE OF THE GOVERNOR, Frankfort, Kentucky, for Appellee Andy Beshear.  T. Chad Thompson, KENTUCKY PUBLIC PROTECTION CABINET, Frankfort, Kentucky, for Appellee Ray Perry.  LeeAnne Applegate, CABINET FOR HEALTH AND

FAMILY SERVICES, Frankfort, Kentucky, for Appellee Wesley Duke.  Jennifer Wolsing, KENTUCKY PUBLIC PROTECTION CABINET, Frankfort, Kentucky, for Appellee Joshua Newton.

MOORE, J., delivered the opinion of the court in which CLAY, J., concurred, and THAPAR, J., concurred in part.  THAPAR, J. (pp. 31–44), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  In March 2020, Andrew Cooperrider expressed on social media his dissatisfaction with Kentucky Governor Andrew Beshear's actions in response to the COVID-19 pandemic.  Cooperrider, the owner of Brewed, a coffee shop and bar in Lexington, took specific offense to Governor Beshear's executive orders requiring masks indoors and prohibiting indoor dining and drinking.  Then, in November 2020, the Kentucky Department of Alcoholic Beverage Control ("DABC") suspended Brewed's alcohol license.  Upon DABC's official revocation of Brewed's license in March 2022, Cooperrider filed suit against the Governor, the DABC commissioner, and a number of other executive-branch officials alleging First Amendment and due-process violations.  According to Cooperrider, his social media postings and the license-revocation action were connected:  the Governor and DABC had allegedly revoked Brewed's alcohol license in retaliation for Cooperrider's protected speech criticizing Beshear and his COVID-19 policies.  All defendants responded to the suit by moving to dismiss.  The district court granted those motions and dismissed the case.  Cooperrider and Brewed now appeal.

We hold that the district court correctly determined that the vast majority of Cooperrider's claims are barred by the doctrines of absolute, qualified, and sovereign immunity, and that it correctly determined that Cooperrider's remaining substantive-due-process claim fails the Rule 12(b)(6) pleading standard.  So we **AFFIRM IN PART** the dismissals.  But because we hold that the district court improperly granted qualified immunity to Appellees Beshear, Perry, and Duke as to Cooperrider's First Amendment retaliation claim, we **REVERSE IN PART** and **REMAND** for further proceedings.

## I. FACTUAL BACKGROUND

### A. Cooperrider's Speech

When the COVID-19 pandemic erupted in March of 2020, Kentucky Governor Andy Beshear declared a state of emergency and issued a number of executive orders intended to protect the public from the spread of the disease. Ky. Exec. Order No. 2020-215 (Mar. 6, 2020) (declaring a state of emergency); Ky. Exec. Order No. 2020-586 (July 9, 2020) (establishing a mask mandate and prohibiting indoor food and beverage service at restaurants and bars); Ky. Exec. Order No. 2020-986 (Nov. 18, 2020) (same). Andrew Cooperrider, the sole owner of Brewed[1], a Lexington, Kentucky coffee shop that also served beer[2], took great issue with the Governor's actions. R. 1 (Compl. at ¶ 12) (Page ID #4). Starting in March 2020, Cooperrider made a series of highly critical posts on social media regarding Beshear and his actions taken in response to the pandemic. *Id.* at ¶ 13 (Page ID #4). Cooperrider made these posts on his own social-media accounts as well as on Brewed's official social-media page. *Id.*

### B. The Enforcement Proceeding

On November 25, 2020, the DABC commenced an enforcement action against Brewed and filed an emergency order suspending Brewed's alcohol license.[3] *Id.* at ¶ 18 (Page ID #5); R. 23-3 (Emer. Susp. Order at 1) (Page ID #344). The emergency-suspension order rested on "two separate and distinct violations by the licensee": first, Brewed's apparent violation of the Governor's executive orders; and second, the establishment's "disorderly conduct" in violation of state law. R. 23-3 (Emer. Susp. Order at 1–2) (Page ID #344–45). The disorderly conduct violation stemmed from an incident on November 24, 2020, when Cooperrider and Brewed

---

[1]The establishment doing business as "Brewed" is a limited liability company incorporated under the name Deans Diner, LLC. We will refer to the establishment as Brewed for clarity.

[2]Brewed had two alcohol licenses in order to serve beer: an NQ4 Malt Beverage Drink License (No. 034-NQ4-162794) and an NQ Malt Beverage Package License (No. 034-NQ-162795). R. 23-3 (Emer. Susp. Order at 2) (Page ID #345). Both were revoked via the emergency suspension order and final revocation. For clarity, we will refer to both licenses as "Brewed's license" or "the alcohol license" throughout.

[3]Cooperrider apparently took issue with the DABC enforcement action and led a citizen effort to seek Governor Beshear's impeachment, resulting in a citizen petition filed with the Kentucky House of Representatives in January 2021. R. 1 (Compl. at ¶ 19) (Page ID #5); *see* Lane Ball, *Kentuckians petition to impeach Gov. Beshear*, WOWK Channel 13 News (Jan. 10, 2021, 11:36 PM), https://www.wowktv.com/news/kentucky/kentuckians-petition-to-impeach-gov-beshear/.

patrons harassed an inspector from the Lexington-Fayette County Health Department ("LFCHD") who had been conducting a regularly scheduled inspection at Brewed. *Id.* at 2–3 (Page ID #345–46). The order stated that "[t]he second basis for this Emergency Suspension Order is independent of the first and does not rely on the Governor's Executive Orders." *Id.* at 1–2 (Page ID #344–45). DABC also served upon Cooperrider a notice of violation ("NOV") providing notice that the Department had initiated administrative proceedings and sought to revoke or suspend Brewed's alcohol license. R. 23-4 (NOV at 1) (Page ID #354).

When the Kentucky General Assembly convened its 2021 Regular Session, the legislature passed legislation overturning Governor Beshear's pandemic-related executive orders and restraining the Governor's power to issue future executive orders. R. 1 (Compl. at ¶ 21–27) (Page ID #5–7). That legislation included House Bill 1 ("HB1"), which loosened the requirements for indoor gathering, including in restaurants and bars; Joint House Resolution 77 ("HR77"), which ended the Governor's orders relating to business shutdowns and capacity restrictions; and certain provisions of House Bill 192 (the Assembly's budget bill) ("HB192"), which prohibited state spending over $10,000 on actions enforcing the COVID-19 executive orders. *Id.*

Meanwhile, the DABC enforcement action against Brewed proceeded, and a hearing was held on May 21, 2021. *Id.* at ¶ 31 (Page ID #8). Then, on March 4, 2022, DABC revoked Brewed's alcohol license. *Id.* at ¶ 35 (Page ID #9). Cooperrider appealed the revocation order in state court. R. 8-2 (State Appeal at 1–14) (Page ID #97–110). According to Governor Beshear's brief, on June 4, 2024, the Fayette Circuit Court reversed DABC's final order revoking Brewed's license. Beshear Br. at 6 n.2 (citing *Deans Diner, LLC d/b/a Brewed v. Alcoholic Beverage Control Bd.*, Civil Action No. 22-CI-00894 (Fayette Cir. Ct. June 4, 2024)). DABC appealed that decision, and the matter is currently pending before the Kentucky Court of Appeals. *Alcoholic Beverage Control Bd. v. Deans Diner, LLC d/b/a Brewed*, No. 2024-CA-0800 (Ky. Ct. App.).

**C.  The Proceedings Below**

Following the revocation of Brewed's alcohol license, Cooperrider and Brewed (hereinafter, "Cooperrider") quickly filed suit against Governor Beshear; Ray Perry, Secretary of the Kentucky Public Protection Cabinet; Wesley Duke, General Counsel for the Kentucky Cabinet for Health and Family Services; Joshua Newton, DABC General Counsel; Allyson Taylor, DABC Commissioner; and Maggie Woods, DABC Malt Beverage Administrator.  R. 1 (Compl. at ¶ 4–9) (Page ID #3).  The complaint alleged violations of Cooperrider's First Amendment and due-process rights.  *Id.* at ¶ 36–50 (Page ID #9–11).  According to Cooperrider, Beshear and DABC had unconstitutionally retaliated against Brewed for Cooperrider's protected speech criticizing the Governor's COVID-19 policies.  *Id.* at ¶ 38–40 (Page ID #9–10).  And by failing to discontinue the enforcement action and continuing to withhold Cooperrider's property—i.e, Brewed's alcohol license—Beshear and DABC had deprived Cooperrider of both procedural and substantive due process.  *Id.* at 45–47 (Page ID #10–11).  Cooperrider sought both compensatory and injunctive relief against all defendants in both their personal and official capacities.

In response to the complaint, Defendants Perry, Beshear, Duke, and Newton moved to dismiss all claims brought against them in both their official and individual capacities.  R. 7 (Perry Mot. to Dismiss); R. 8 (Beshear Mot. to Dismiss); R. 9 (Duke Mot. to Dismiss); R. 23 (Newton Mot. to Dismiss).  The district court granted all four motions via a memorandum opinion and order issued on March 23, 2023, and terminated the case as to defendants Perry, Beshear, Duke, and Newton.  R. 26 (Mem. Op. and Order I).

Defendants Woods and Taylor initially filed answers.  R. 12 (Woods Answer), R. 13 (Taylor Answer).  After the district court dismissed defendants Perry, Beshear, Duke, and Newton, only Defendants Woods and Taylor remained.  Woods and Taylor filed a joint motion to dismiss.  R. 27 (Taylor/Woods Mot. to Dismiss).  The district court granted the motion, dismissed both defendants from the case, and adjudged the action dismissed via a memorandum opinion and order and accompanying final judgment on March 19, 2024.  R. 33 (Mem. Op. and Order II), R. 34 (Judgment).  Cooperrider timely appealed.  R. 35 (Notice of Appeal at 1) (Page ID #500).

## II. DISCUSSION

### A. Standard of Review

Via its March 23, 2023 and March 19, 2024 orders, the district court dismissed all of Cooperrider's claims against each Defendant. It did so pursuant to two different rules: Federal Rule of Civil Procedure 12(b)(6), which relates to the factual sufficiency of a complaint, and Federal Rule of Civil Procedure 12(b)(1), which relates to a complaint's jurisdictional sufficiency.

"We review de novo a district court's decision to grant a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)." *Middlebrooks v. Parker*, 15 F.4th 784, 789 (6th Cir. 2021). "To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a facially plausible claim requires courts to construe the complaint in a light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and decide whether there is enough factual content to allow 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mich. First Credit Union v. T-Mobile USA, Inc.*, 108 F.4th 421, 425 (6th Cir. 2024) (quoting *Iqbal*, 556 U.S. at 678).

Similarly, "[w]e review de novo the district court's ruling on a Rule 12(b)(1) motion to dismiss." *Am. Reliable Ins. Co. v. United States*, 106 F.4th 498, 504 (6th Cir. 2024). In reviewing the district court's dismissal for lack of subject-matter jurisdiction, we "must construe the complaint in the light most favorable to the Plaintiffs; however, the Court need 'not presume the truth of factual allegations pertaining to our jurisdiction to hear the case.'" *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 731–32 (6th Cir. 2022) (quoting *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015)). "The party invoking federal jurisdiction bears the burden of proving that we have jurisdiction over a given claim." *Carman v. Yellen*, 112 F.4th 386, 399 (6th Cir. 2024).

**B. Individual-Capacity Claims**

We first address Cooperrider's claims against Defendants in their individual capacities. Cooperrider seeks damages under 42 U.S.C. § 1983 from Defendants for their alleged violations of his First Amendment and due-process rights. The district court determined that all of Cooperrider's claims against Defendants in their individual capacities were barred by the doctrines of absolute and qualified immunity. R. 26 (Mem. Op. and Order I at 12–13) (Page ID #420–21); R. 33 (Mem. Op. and Order II at 9) (Page ID #497). We consider the district court's application of each form of immunity, as applied to each Defendant, in turn.

**1. Absolute Immunity**

The district court held that all three DABC officials against whom Cooperrider brought suit—Newton, Woods, and Taylor—were entitled to absolute immunity for their actions taken in furtherance of DABC's enforcement action against Brewed. "We review a district court's grant of absolute immunity *de novo*." *Turner v. Lowen*, 823 F. App'x 311, 317 (6th Cir. 2020) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 373–74 (6th Cir. 2009)). At the same time, "[t]he burden of justifying absolute immunity rests on the official asserting the claim." *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982). On appeal, Newton, Woods, and Taylor bear the burden of proving their entitlement to absolute immunity.

**a. Newton**

"Absolute prosecutorial immunity . . . is a common law principle that shields a prosecutor from § 1983 liability." *Cooper v. Parrish*, 203 F.3d 937, 946 (6th Cir. 2000). The Supreme Court has long held that prosecutors are entitled to absolute immunity for actions taken within the scope of their duties "in initiating a prosecution and in presenting the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976); *see also Prince v. Hicks*, 198 F.3d 607, 611 (6th Cir. 1999) ("A prosecutor is entitled to absolute immunity when that prosecutor acts 'as an advocate for the State' and engages in activity that is 'intimately associated with the judicial phase of the criminal process.'") (quoting *Imbler*, 424 U.S. at 430–31).

"The Supreme Court has endorsed a 'functional' approach for determining whether an official is entitled to absolute prosecutorial immunity, explaining that a court should look to 'the nature of the function performed, not the identity of the actor who performed it.'" *Cooper*, 203 F.3d at 946–47 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). This approach "focuses on whether the prosecutor's activities are 'intimately associated with the judicial phase of the criminal process.'" *Id.* (quoting *Imbler*, 424 U.S. at 430). So, under the functional approach, we have held that "[a]bsolute immunity extends to a prosecutor's conduct in 'initiating a prosecution and in presenting the [government's] case'" as well as "the 'administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution.'" *Rieves v. Town of Smyrna*, 959 F.3d 678, 691 (6th Cir. 2020) (first quoting *Imbler*, 424 U.S. at 431) (then quoting *Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th. Cir. 1997)).

Applying the functional approach, the Supreme Court "has extended absolute immunity to certain others who perform functions closely associated with the judicial process." *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985). Specifically, in *Butz v. Economou*, the Court held that the protections of absolute immunity extend to administrative agency officials "who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication." 438 U.S. 478, 516 (1978)[4]; *see also Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006) (stating that absolute prosecutorial immunity "also extends beyond the criminal process to conduct in civil proceedings where a government attorney is operating in an enforcement role in 'initiating . . . judicial proceedings'") (quoting *Cooper*, 203 F.3d at 947). The question before us, then, is whether Newton, DABC's general counsel and the person responsible for initiating and

---

[4]Cooperrider argues that *Butz* is inapplicable here because that case, involving the United States Department of Agriculture, extended absolute immunity only to persons "performing adjudicatory functions within a federal agency." 438 U.S. at 514. Specifically, Cooperrider argues that "[t]he entirety of the analysis in *Butz* rests upon the fact that significant Administrative Procedure Act protections are afforded in federal matters" such that the same logic does not extend to state agency officials, who are not bound by the APA. Appellant Br. at 24–25. But we squarely addressed this question decades ago in *Watts v. Burkhart*, 978 F.2d 269 (6th Cir. 1992) (en banc). In that case, we concluded that it followed from the Supreme Court's conclusion in *Butz* "that state officials subject to restraints comparable to those imposed by the Administrative Procedure Act and performing adjudicatory functions in resolving potentially heated controversies are entitled to absolute immunity from damages liability for their judicial acts." *Watts*, 978 F.2d at 273. Driving home the point, we stated that "the case law in this circuit and elsewhere is very clear: public policy requires absolute immunity for officials performing quasi-prosecutorial or quasi-judicial functions, at least where protections *such as those provided by the Administrative Procedure Act* are in place." *Id.* at 274 (emphasis added). The protections of absolute immunity therefore apply with equal force to state agency officials performing judicial and prosecutorial functions as they do to federal agency officials.

continuing the enforcement action against Brewed, functioned in a prosecutorial role in initiating and continuing those proceedings. *See* Newton Br. at 6–14. We answer that question in the affirmative.

To determine whether an individual public official is entitled to absolute immunity, "we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted" and "evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester*, 484 U.S. at 224. The complaint alleges that Newton, in his role as DABC general counsel, made the discretionary decision to initiate and continue an enforcement proceeding against Brewed. R. 1 (Compl. at ¶ 20) (Page ID #5) (stating that Newton sent emails "reflect[ing] a concerted effort to deprive Plaintiffs of their alcohol licenses"); *id.* at ¶ 18, 31 (Page ID #5, 8) (referring to all Defendants, including Newton, collectively). These allegations are supported by the fact that Newton signed and served Brewed with the NOV, putting Cooperrider on notice that DABC had initiated an administrative proceeding before the Alcoholic Beverage Control Board and sought to revoke or suspend Brewed's alcohol license. R. 23–4 (NOV at 1) (Page ID #354). And the recommended order issued by the hearing officer lists Newton as having represented DABC at the revocation hearing. R. 8–2 (Rec. Order at 1) (Page ID #119).

Newton's role in the license-revocation proceeding appears to have been a quintessentially prosecutorial one: initiating, and then litigating, an enforcement proceeding against Brewed that resulted in an agency adjudication revoking its alcohol license. *See, e.g.*, *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 694 (6th Cir. 2013) (holding that social workers, who "often engage in prosecutorial functions when carrying out their duties," are "entitled to absolute immunity when they engage in conduct 'intimately associated with the judicial phase of the criminal process'" such as "initiating court actions or testifying under oath" in child-welfare proceedings) (quoting *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 724 (6th Cir. 2011)). The critical question is whether Newton was "functioning in an enforcement role and acting as [an] advocate[] for the state in initiating and prosecuting judicial proceedings," in which case he is "entitled to an absolute immunity defense." *Cooper*, 203 F.3d at 947. We conclude that Newton was.

Our conclusion tracks with that of the Fifth Circuit, which addressed this very question in *Spec's Family Partners, Ltd. v. Nettles*, 972 F.3d 671 (5th Cir. 2020). There, a liquor store chain operator brought a civil-rights action against Texas Alcoholic Beverage Commission ("TABC") officials who had refused to renew the business's alcohol permits and who had advocated against the granting of new permits for additional chain locations. *Id.* at 675. The Fifth Circuit determined that the officials' challenged conduct in placing administrative holds on permits, protesting the granting of new permits, and making decisions regarding renewal permits "was akin to prosecutors intimately involved in judicial proceedings and therefore 'entitled to absolute immunity from suit.'" *Id.* at 678 (quoting *Disraeli v. Rotunda*, 489 F.3d 628, 632 (5th Cir. 2007)). The Fifth Circuit thus held that the TABC officials "were functioning in quasi-prosecutorial roles as the State's advocate in a way 'intimately associated with' judicial proceedings." *Id.* at 679 (quoting *Imbler*, 424 U.S. at 431); *see also Romano v. Bible*, 169 F.3d 1182, 1187 (9th Cir. 1999) (holding that members of the Nevada Gaming Control Board were entitled to absolute quasi-prosecutorial immunity from damages liability in a § 1983 action arising from disciplinary proceedings against a former gaming licensee, where the Board acted as a prosecutor in investigating and deciding to file a complaint against the licensee and entered into settlement negotiations with him); *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1373 (8th Cir. 1996) (holding that a child-welfare officer who initiated proceedings in state court leading to the award of temporary protective custody of a child to the state acted in a role that "was functionally comparable to that of a prosecutor" and thus was "absolutely immune from liability"); *Glunk v. Pennsylvania State Bd. of Med.*, 687 F. App'x 196, 202 (3d Cir. 2017) (holding that prosecutors in a disciplinary proceeding brought by the state board of medicine against a physician were absolutely immune from suit for money damages, where the proceeding resulted in a 60-day suspension of doctor's medical license and a fine).

Like the officials in *Nettles*, Newton functioned in a quasi-prosecutorial role in initiating and prosecuting the enforcement action against Brewed. Newton exercised his discretion in deciding to initiate the license-revocation proceeding, and then acted as an advocate for the state in continuing to argue for the revocation of Brewed's license, up to and including his representation of DABC at the administrative hearing. Newton's role was one "intimately associated" with the agency's adjudicatory proceedings. *Imbler*, 424 U.S. at 431. Newton is

therefore protected from damages liability under the doctrine of absolute quasi-prosecutorial immunity.  The district court did not err in dismissing Cooperrider's claims against Newton in his individual capacity.

### b.  Woods and Taylor

Like the doctrine of prosecutorial immunity, the doctrine of absolute judicial immunity has long been recognized at common law as necessary to "shield[] judges from collateral attacks challenging a judge's actions taken in her official judicial capacity." *Morgan v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 518 (6th Cir. 2023).  "This immunity is absolute: all of a judge's actions taken in an official judicial capacity are immune from suit." *Id.*  And as it has for absolute prosecutorial immunity, the Supreme Court has extended the protections of absolute judicial immunity to "non-judicial officers who perform 'quasi-judicial' duties." *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994) (quoting *Joseph v. Patterson*, 795 F.2d 549, 560 (6th Cir. 1986)).  So, when the Supreme Court in *Butz* determined that administrative agency officials performing quasi-prosecutorial functions were entitled to absolute immunity, it also held that those individuals "performing adjudicatory functions within a[n] . . . agency are entitled to absolute immunity from damages liability for their judicial acts." *Butz*, 438 U.S. at 514.[5]

We employ the same "functional" approach in determining whether state administrative officials performing quasi-judicial duties are entitled to absolute immunity. *Forrester*, 484 U.S. at 229.  Under that approach, we look to "the nature of the function being performed rather than the identity of the actor performing it." *McKenzie, Grant, Konvalinka & Harrison, PC v. Banks* (*In re McKenzie*), 716 F.3d 404, 412 (6th Cir. 2013).  Here, Woods and Taylor—DABC's commissioner and malt beverage administrator, respectively—argue that they acted in a quasi-

---

[5]The dissent takes issue with the notion that absolute judicial immunity may extend to individuals outside of the judicial branch.  Dissent at 35.  But the doctrine of quasi-judicial immunity is not a novel one.  Instead, it is a well-settled principle of law that certain non-judicial governmental officials are entitled to absolute immunity from suit for their performance of "quasi-judicial" duties. *See, e.g.*, *Bush*, 38 F.3d at 847; *Joseph*, 795 F.2d at 560; *Johnson v. Granholm*, 662 F.2d 449, 450 (6th Cir. 1981) (per curiam); *Denman v. Leedy*, 479 F.2d 1097, 1098 (6th Cir. 1973) (per curiam); *Hurlburt v. Graham*, 323 F.2d 723, 725 (6th Cir. 1963).  So the suggestion that the application of absolute immunity to "any official, from any branch of government" is impermissible directly contradicts our longstanding precedent.  Dissent at 35.

judicial capacity when they issued the final order revoking Brewed's alcohol license.  Woods and Taylor Br. at 11–13.  We agree.

While we lack the benefit of precedent as to whether state agency commissioners who suspend or revoke liquor licenses enjoy absolute immunity—in fact, we expressly reserved any decision on this exact question in *Flying Dog Brewery, LLLP v. Michigan Liquor Control Comm'n*, 597 F. App'x 342, 349 (6th Cir. 2015) ("We expressly do not . . . consider whether the Hearing Commissioners who suspend or revoke liquor licenses in disciplinary cases are entitled to quasi-judicial immunity.")—our en banc decision in *Watts v. Burkhart* provides guidance. *Watts* involved a Tennessee physician who brought a § 1983 action against members of the Tennessee Board of Medical Examiners, in their individual capacities, for their roles in presiding over an administrative hearing to determine whether Watts had prescribed controlled substances in unsafe quantities and summarily suspending his medical license.  978 F.2d at 271. Determining that "the quasi-judicial function exercised by the defendants in the case at bar appears comparable to functions that have long been accorded absolute immunity at common law" and that the members of the board were "subject to restraints and safeguards comparable to those built into the archetypal judicial process," we concluded that the board members were entitled to absolute quasi-judicial immunity.  *Id.* at 275, 278.

In the years following *Watts*, we have applied its logic in affording absolute immunity to members of a state board of education for their role in overseeing administrative hearings and adjudicating the removal of members of a county board of education, *Hale v. Cody*, 188 F.3d 507 (6th Cir. 1999) (table) (per curiam), as well as members of a state parole board for their role in scheduling parole hearings and making parole determinations, *Hughes v. Duncan*, 93 F.4th 374, 381 (6th Cir. 2024).  On the other hand, we have declined to extend the protection of absolute immunity to members of a university faculty grievance committee for their role in handling a faculty member's tenure-denial grievance, *Purisch v. Tennessee Tech. Univ.*, 76 F.3d 1414, 1422 (6th Cir. 1996); to the director of a state bar association for his alleged conduct in threatening a picketer outside his residence, *Dean v. Byerley*, 354 F.3d 540, 557 (6th Cir. 2004); or to the members of a state environmental-quality department for their actions related to the water crisis in Flint, Michigan, *Boler v. Earley*, 865 F.3d 391, 416 (6th Cir. 2017).

*Watts* and its progeny articulate a set of factors that inform our analysis as to whether an agency official is entitled to quasi-judicial immunity. First, we look to whether the officials' "positions are akin to that of judges." *Purisch*, 76 F.3d at 1422 (quoting *Watts*, 978 F.2d at 278). Second, we determine whether "the potential for vexatious lawsuits is great." *Id.* Third, we determine whether "enough safeguards exist to protect [the complainant's] constitutional rights." *Id.* We conclude that Woods and Taylor, acting in their roles as adjudicators of DABC licensure revocation proceedings, meet all three criteria.[6]

First, Woods and Taylor performed a function "normally performed by an adjudicator," *Dean*, 354 F.3d at 556. As agency heads, Woods and Taylor are authorized by statute to oversee the conduct of administrative hearings and to delegate the power to issue recommended orders to subordinate hearing officers. Ky. Rev. Stat. § 13B.030(1). Once a hearing officer has issued a recommended order, the agency heads must "consider the record including the recommended order and any exceptions duly filed to a recommended order" and determine whether to accept the hearing officer's recommendation, to modify it, or to reject it. Ky. Rev. Stat. § 13B.120(1)–(2). The agency heads then issue a final order, "in writing and stated in the record"; "[i]f the final order differs from the recommended order, it shall include separate statements of findings of fact and conclusions of law." Ky. Rev. Stat. § 13B.120(3). Once issued, a final order is immediately appealable to the state circuit court. Ky. Rev. Stat. § 13B.140(1). This function—issuing final orders in administrative adjudications following the issuance of a recommended order by an inferior adjudicator—is analogous to that of a judge reviewing a report and recommendation issued by a magistrate judge and making a final determination to accept, modify, or depart from the magistrate judge's recommendation. *See* Fed. R. Civ. P. 72(b). Here, while the hearing officer directly overseeing Brewed's license revocation hearing played the role of a magistrate judge, Woods and Taylor, in issuing the final order—which reviewed the hearing officer's findings and made its own statements of fact and conclusions of law—played the role of

---

[6]The dissent contends that we apply the three-factor *Watts* test in error and instead applies a six-factor test set out by the Supreme Court in *Cleavinger*. Dissent at 39. But *Watts*, a case decided by an en banc panel of this court, was issued seven years after *Cleavinger*. And, as the dissent notes, we repeatedly cited *Cleavinger* in coming to our conclusion in *Watts*. Dissent at 39; *Watts*, 978 F.2d at 276. So while we are bound by Supreme Court precedent, the subsequent *Watts* en banc decision provides binding precedent with respect to the applicable test for determining an individual's entitlement to absolute quasi-judicial immunity.

the district judge.  R. 8–2 (Final Order at 1–7) (Page ID #111–17).  This factor therefore weighs in favor of granting Woods and Taylor absolute quasi-judicial immunity.**7**

Second, the cases Woods and Taylor decide as DABC agency heads are "sufficiently controversial that, in the absence of immunity, [they] would be subject to numerous damages actions."  *Bon-Ing, Inc. v. Hodges*, 700 F. App'x 461, 464 (6th Cir. 2017).  Woods and Taylor issue orders suspending and revoking licenses to sell alcoholic beverages.  Each of these orders creates an aggrieved business owner likely to be displeased with an adverse outcome.  As a result, both agency heads' ability to operate "would undoubtedly be hindered if they were routinely sued for damages" for suspending and revoking alcohol licenses.  *Flying Dog*, 597 F. App'x at 350.  So, to "assure that [Woods and Taylor] can perform [their] functions without harassment or intimidation," *Cleavinger*, 474 U.S. at 202, it is necessary that their adjudicatory actions be shielded from vexatious damages suits.  *See Purisch*, 76 F.3d at 1422.  This factor also weighs in favor of granting absolute immunity to Woods and Taylor.

Finally, a number of regulatory safeguards established by Kentucky law protect those subjected to license-revocation proceedings, "tend[ing] to reduce the need for private damages actions as a means of controlling unconstitutional conduct."  *Hughes*, 93 F.4th at 379 (quoting *Butz*, 438 U.S. at 512).  Chapter 13B of the Kentucky Revised Statutes sets forth the rules governing administrative hearings—the right to which is guaranteed by law under Ky. Rev. Stat.

---

**7**The dissent contends that this factor instead cuts against Woods and Taylor because "[t]he administrators here don't look much like judges."  Dissent at 39.  In particular, the dissent emphasizes the fact that Woods and Taylor "are state employees—subordinate to the governor" and do not have removal protections or serve fixed terms.  *Id.*  True, although department heads are appointed by the governor for "terms not exceeding four (4) years," these officials "may be removed from office by the Governor for any cause the Governor deems sufficient."  Ky. Rev. Stat. §§ 12.040(1), 63.080(1).  But the fact that Woods and Taylor, as department heads, do not enjoy removal protections does not mean that they serve any less of an adjudicatory role.  Such a conclusion would be in direct conflict with our precedent.  *See, e.g.*, *Hughes*, 93 F.4th at 380–81 (holding that members of the Tennessee Board of Parole are entitled to absolute quasi-judicial immunity even though the Board members are appointed by the governor because, unlike the prison discipline committee at issue in *Cleavinger*, the Board members are not "direct subordinates of the warden who reviews their decision") (quoting *Cleavinger*, 474 U.S. at 204).  Here, like the parole board members in *Hughes*, Woods and Taylor, although appointed by the governor to their positions, are not direct subordinates to the governor but operate their department at their "direction and control."  Ky. Rev. Stat. § 12.040(1).  Nor are their decisions as to the final revocation of alcohol licenses reviewable by the governor.

Regardless, in its analysis of this *Watts* factor, the dissent focuses on the wrong point.  The test for whether an administrative official is entitled to quasi-judicial immunity is a *functional* one; we ask not whether an individual *seems* like a judge, but whether they *act* like a judge.  Woods and Taylor, in issuing a final revocation order that made its own findings of fact and conclusions of law, acted like judges in revoking Cooperrider's license.

§ 243.520—in the state, including license-revocation hearings before the DABC. Ky. Rev. Stat. § 13B.020(1). These rules provide extensive procedural safeguards to parties who appear at such hearings. Prior to a hearing, the agency must provide at least twenty days of advance notice to the parties. Ky. Rev. Stat. § 13B.050(1). That notice must include a statement advising the parties of their right to legal counsel. Ky. Rev. Stat. § 13B.050(3)(f). At a hearing, the presiding hearing officer must "afford all parties the opportunity to respond, present evidence and argument, conduct cross-examination, and submit rebuttal evidence." Ky. Rev. Stat. § 13B.080(4). Following a hearing, the hearing officer makes findings of facts "based exclusively on the evidence on the record." Ky. Rev. Stat. § 13B.090(1). The hearing officer then drafts a recommended order, including her findings of fact, conclusions of law, and recommended disposition of the hearing, which she submits to the agency head within sixty days of receiving an official record of the hearing. Ky. Rev. Stat. § 13B.110(1). The recommended order must be sent to each party, which has fifteen days to file exceptions to the recommendations. Ky. Rev. Stat. § 13B.110(4). The agency head then issues a final order, which must contain a statement advising parties of their appeal rights. Ky. Rev. Stat. § 13B.120(3). Finally, all final orders issued by agency heads are subject to judicial review in the state circuit court. Ky. Rev. Stat. § 13B.140(1).

"Because these adversarial features of the [agency's] hearing process 'tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.'" *Hughes*, 93 F.4th at 380 (quoting *Butz*, 438 U.S. at 512). And the availability of judicial review "tilts this factor toward granting quasi-judicial immunity because any errors of [the agency heads] may be 'largely remediable through the appellate process.'" *Flying Dog*, 597 F. App'x at 352 (quoting *Heyde v. Pittenger*, 633 F.3d 512, 519 (7th Cir. 2011)). These fulsome safeguards reduce the need for private damages actions such as Cooperrider's. *See, e.g.*, *Watts*, 978 F.2d at 275–77 (holding that the Tennessee Board of Medical Examiners was governed by adequate safeguards because it was required to comply with Tennessee's version of the Administrative Procedure Act).[8]

---

[8]The dissent, while acknowledging that this factor "remains a close call," reasons that this factor, too, weighs against Woods and Taylor. Admitting that Kentucky statute provides "real procedural safeguards" to those

"'[O]fficials who seek absolute immunity must squarely shoulder the burden of showing that public policy demands an exemption [from damages liability] of that scope.'" *Watts*, 978 F.2d at 278 (quoting *Bettencourt v. Bd. of Registration in Med.*, 904 F.2d 772, 784 n.15 (1st Cir. 1990)). Woods and Taylor can and do meet this burden, having shown that "their positions are akin to that of judges," "the potential for vexatious lawsuits is great," and that there are "enough safeguards" under Kentucky law to protect the constitutional rights of alcohol-license holders. *Id.* They are therefore entitled to absolute immunity from damages.[9][10]

Cooperrider argues that our decision in *Flying Dog* forecloses granting absolute immunity to Woods and Taylor. Appellant Br. at 27–28; *see Flying Dog*, 597 F. App'x at 352 (declining to extend absolute quasi-judicial immunity to members of the Michigan Liquor

---

subject to alcohol-license-revocation proceedings, the dissent nevertheless finds these safeguards inadequate to protect licenseholders because "Taylor and Woods aren't neutral hearing officers." Dissent at 40. The dissent's main qualm appears to be that, under Kentucky's statutory scheme, the department heads can reject or modify a hearing officer's recommended order, as was the case here. Ky. Rev. Stat. § 13B.120(2). But if the agency heads modify or reject a recommended order in any way, the final order must "include separate statements of findings of fact and conclusions of law." Ky. Rev. Stat. § 13B.120(3). And, as discussed, the agency's final order is immediately appealable. So the dissent's fears of agency heads engaging in freewheeling, partisan conduct is vitiated by the statute's careful, multi-level procedural structure.

[9]This conclusion is consistent with the Seventh Circuit's decision in *Killinger v. Johnson*, 389 F.3d 765 (7th Cir. 2004). There, the Seventh Circuit considered the question of whether a village mayor, serving in his role as local liquor-control commissioner, was entitled to absolute quasi-judicial immunity in a § 1983 suit brought by an aggrieved bar owner over the suspension of his liquor license. *Id.* at 768. The Seventh Circuit concluded that the mayor was so entitled, determining that the mayor was "performing a judicial function when he temporarily closed [the bar], fined Killinger, and suspended his license." *Id.* at 770. The court also noted the importance of regulatory protections under Illinois law guiding the mayor's exercise of authority in his role as liquor commissioner, including notice and hearing requirements, evidentiary protections, and the availability of judicial review. *Id.* (citing Ill. Rev. Stat. ch. 43, ¶ 153 (1983)).

[10]As stated above, the dissent argues that we should instead apply the six factors set forth in *Cleavinger* in evaluating Woods's and Taylor's entitlement to absolute immunity. But even if we were to evaluate this issue under *Cleavinger*'s factors, we would reach the same conclusion as we reach under those set forth in *Watts*. Those factors are "(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal." *Cleavinger*, 474 U.S. at 202. The third and fourth factors arguably cut against granting absolute immunity to Woods and Taylor, who are appointed by and removable at will by the governor and who, in issuing final revocation orders, are not legally bound by precedent. But the first, second, fifth, and sixth factors all favor granting absolute immunity in this circumstance: license revocation proceedings are fraught, and DABC adjudicators need to do their jobs without threat of harassment; a multitude of safeguards protect the due-process rights of licenseholders in revocation proceedings; license revocation proceedings are undoubtedly adversarial; and final revocation orders are immediately appealable to the appropriate state circuit court. So while not every factor leans in favor of granting absolute immunity to Woods and Taylor, the *Cleavinger* factors weigh in favor of granting such immunity.

Control Commission for their role in denying a brewery's license to sell their beer in the state). But as discussed above, we expressly declined in *Flying Dog* to address the question presented here. *Id.* at 349. And the factual differences between the actions taken by the commissioners in *Flying Dog* and the actions taken by Woods and Taylor distinguish the two cases. First, "[t]he Commission's rules . . . provide more extensive procedural safeguards to parties who appear before the Hearing Commissioners due to liquor violations than to parties who appear before the Administrative Commissioners on initial licensing matters." *Id.* at 350. And unlike the commissioners in *Flying Dog*, Wood and Taylor were required by regulation "to explain their decisions through findings of fact and conclusions of law." *Id.* at 351. Additionally, while the licensure proceeding in *Flying Dog* lacked many of the adversarial characteristics of a judicial proceeding, the license revocation hearing in this case involved the opportunity for both parties to present evidence and argument, the presentation and examination of witnesses, and the ability to make and record evidentiary objections. *See* Ky. Rev. Stat. § 13B.080(4).

Woods and Taylor exercised functions more comparable to those of judges, and were subject to more restraints and safeguards, than the agency officials in *Flying Dog*. Both Woods and Taylor are entitled to absolute immunity. Accordingly, we affirm the district court's dismissal of Cooperrider's claims for damages against Woods and Taylor in their individual capacities based on absolute immunity.

### 2. Qualified Immunity

The district court determined that Cooperrider's individual-capacity claims against the remaining Defendants—Beshear, Perry, and Duke—were barred by the doctrine of qualified immunity. R. 26 (Mem. Op. and Order I at 13) (Page ID #421). We review the district court's qualified-immunity determination de novo. *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011).

"The doctrine of qualified immunity provides that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Skatemore*, 40 F.4th at 738 (quoting *Williams v.*

*Maurer*, 9 F.4th 416, 430 (6th Cir. 2021)).  "While the defendant 'bears the burden of pleading' a qualified immunity defense, '[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.'"  *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) (quoting *Estate of Hill v. Miracale*, 853 F.3d 306, 312 (6th Cir. 2017)) (brackets in original).

Because Beshear, Perry, and Duke all raised qualified-immunity defenses in their motions to dismiss, R. 7 (Perry Mot. to Dismiss at 11) (Page ID #70), R. 8 (Beshear Mot. to Dismiss at 16–17) (Page ID #92–93), R. 9 (Duke Mot. to Dismiss at 10–11) (Page ID #178–79), the burden rests with Cooperrider on appeal to show that no Defendant is entitled to qualified immunity.  "To overcome a qualified immunity defense, the plaintiff must show (1) that the defendant violated his federal rights and (2) that the 'contours of the right' were sufficiently clear that 'a reasonable offic[ial] in the defendant's position should have known his conduct violated that right.'"  *Ramsey v. Rivard*, 110 F.4th 860, 866 (6th Cir. 2024) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)).

We have repeatedly cautioned, however, that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity."  *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015).  Although the Supreme Court has directed that "qualified immunity is a threshold question to be resolved at the earliest possible point in the proceedings," *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003), "that point is usually summary judgment and not dismissal under Rule 12," *Wesley*, 779 F.3d at 433–34.  This is because, "'[a]bsent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is "obvious" or "squarely governed" by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not' for purposes of determining whether a right is clearly established." *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)).  Thus, "even though we retain jurisdiction over this type of appeal, this Court generally denies qualified immunity at the motion to dismiss stage in order for the case to proceed to discovery, so long as the plaintiff states a plausible claim for relief." *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020).

Here, the district court found that Cooperrider's complaint failed plausibly to allege a First Amendment retaliation claim, substantive-due-process claim, or procedural-due-process claim.  R. 26 (Mem. Op. and Order I at 12–13) (Page ID #420–21).  Having determined that Cooperrider failed to plead facts demonstrating the violation of any constitutional right, the district court did not proceed to an analysis of whether the at-issue rights were clearly established.  We evaluate the district court's determination as to each claim in turn.

### a.  First Amendment Retaliation

Cooperrider argues that Beshear, Perry, and Duke violated his First Amendment rights by retaliating against him for his critical social-media activity by initiating the enforcement action against Brewed.  Appellant Br. at 15.  "To prove a First Amendment retaliation claim, a plaintiff must show: (1) he engaged in protected speech; (2) the defendant took an adverse action against him; and (3) there is a causal connection between the protected speech and the adverse action." *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024).  All parties agree that Cooperrider engaged in protected speech when he wrote critically of the Governor and his administration's response to the COVID-19 pandemic.  The question before us, then, is whether Cooperrider adequately pleaded an adverse action taken by the Defendants—i.e., the initiation and continuation of enforcement proceedings against Brewed and the permanent revocation of Brewed's alcohol license—and that the action was causally connected to Cooperrider's protected speech.  The district court determined that the complaint failed plausibly to allege a First Amendment retaliation claim.  R. 26 (Mem. Op. and Order I at 16–19) (Page ID #424–27).  We disagree.

First, Cooperrider adequately pleaded an adverse action:  that Beshear, Perry, and Duke directed and oversaw the enforcement proceeding against Brewed and the ultimate revocation of Brewed's alcohol license.  For First Amendment retaliation purposes, an adverse action is one that "would chill or silence a 'person of ordinary firmness' from future First Amendment activities."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999) (en banc) (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996)).  "Any adverse actions, other than 'those that create only de minimis negative consequences,' can 'offend the Constitution.'" *Josephson*, 115 F.4th at 787 (quoting *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021)).

Critically, "[w]hether an alleged adverse action is sufficient to deter a person of ordinary firmness is generally a question of fact." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583–84 (6th Cir. 2012). "The adverse nature of a particular action 'will depend on context.'" *Josephson*, 115 F.4th at 787 (quoting *Bell v. Johnson*, 308 F.3d 594, 602–03 (6th Cir. 2002)). "As a result, retaliation claims based on all but genuinely 'inconsequential' official actions 'should go to the jury.'" *Id.* (quoting *Bell*, 308 F.3d at 603).

Here, Cooperrider alleges that Beshear, Perry, and Duke chose to initiate[11] and continue[12] an enforcement action against Brewed, resulting in the revocation of Brewed's license to serve alcohol. We have repeatedly found similar actions sufficiently adverse to meet this element of a retaliation claim. *See, e.g.*, *Josephson*, 115 F.4th at 787 (holding that a school's decision not to renew a teacher's contract was "a traditional example of an adverse action"); *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010) (affirming the district court's holding that a government employee's "dilatory tactics with respect to reissuing permits . . . amounted to adverse acts that would deter a person of ordinary firmness from engaging in the protected petitioning activity"); *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 725–26 (6th Cir. 2010) (holding that an allegation that Township officials had threatened to revoke a resident's special-use permit was sufficient to show an adverse action at the pleading stage). The complaint's allegation that Defendants made the decision to commence license-revocation proceedings

---

[11]In his brief, Governor Beshear states that Cooperrider "conceded in [his] Complaint that the institution of the ABC enforcement action was not adverse, admitting ABC initiated the action in response to Appellants' 'non-compliance with [public health] orders.'" Beshear Br. at 17 (quoting R. 1 (Compl. at ¶ 18) (Page ID #5)). The Governor is incorrect that Cooperrider concedes this point. The complaint merely states that "Defendants instituted an enforcement action against Plaintiff, seeking the revocation of its Alcohol Licenses . . . on or about November 25, 2020, for non-compliance with those orders." R. 1 (Compl. at ¶ 18) (Page ID #5). And "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X*, 175 F.3d at 386. Here, Cooperrider alleges that, even if in part motivated by Brewed's failure to follow public health laws, Defendants' decision to initiate the enforcement proceeding against Brewed was also motivated, and substantially so, by Defendants' desire to retaliate against him for his protected speech.

[12]The district court held, and Defendants now argue on appeal, that it would be "illogical to suggest that the continuation of [an action] that was already under way could possibly be retaliatory." R. 26 (Mem. Op. and Order I at 16) (Page ID #424) (quoting *Ryan v. Blackwell*, 979 F.3d 519, 525 (6th Cir. 2020)). But Cooperrider's claim is not that Defendants merely continued the ongoing enforcement action against Brewed; instead, it is that they continued the action despite the intervening passage of legislation that should have, in Cooperrider's view, rendered the action baseless. And it is not illogical to suggest that the continuation of an action rendered baseless by intervening law could have been retaliatory.

against Brewed, on its face, supports a reasonable inference that Cooperrider suffered an adverse action.

Second, the complaint contains sufficient facts demonstrating that "'the adverse action was motivated at least in part by [Cooperrider's] protected conduct.'" *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)).[13]  To show causation, a complainant must point to "'specific, nonconclusory allegations' reasonably linking her speech" to the adverse action. *Bailey v. Floyd Cnty. Bd. of Educ. By & Through Towler*, 106 F.3d 135, 144 (6th Cir. 1997) (quoting *Wright v. Illinois Dep't of Child. & Fam. Servs.*, 40 F.3d 1492, 1500 (7th Cir. 1994)).  Cooperrider's complaint does so.  Accepting all well-pleaded factual allegations in the complaint as true, Beshear, Perry, and Duke all (1) knew about Cooperrider's critical social-media posts and (2) decided to initiate the enforcement action against Brewed because of Cooperrider's comments.[14]  The complaint makes several allegations relating to the causation element, including that "Defendants were each aware of, and angered by, the social media activity of the Plaintiffs," R. 1 (Compl. at ¶ 15) (Page ID #4); that Governor Beshear had, "in public statements and speeches, directly addressed the speech of Plaintiffs, usually in a manner that expresse[d] his anger at such speech," *id.* at ¶ 16; that "Email communications by and between Defendants Duke, Newton, and Taylor, in particular reflect a concerted effort to deprive Plaintiffs of their alcohol licenses," *id.* at ¶ 20 (Page ID #5); that "[i]nternal emails, communications, and

---

[13]The district court, in determining that the complaint failed to allege causation, pointed to our holding in *Leonard v. Robinson* that "[a] 'motivating factor' is essentially but-for cause—'without which the action being challenged simply would not have been taken.'" R. 26 (Mem. Op. and Order at 16) (Page ID #424) (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (quoting *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002))).  That holding stemmed from the Supreme Court's decision in *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), in which the Court held that, "where constitutionally protected speech is 'a 'motivating factor'' in governmental action adverse to the plaintiff, the adverse action is unconstitutional . . . unless the same action would have been taken 'even in the absence of the protected conduct.'" *Greene*, 310 F.3d at 897 (quoting *Mount Healthy*, 429 U.S. at 287).  Critically, however, *Leonard* and *Greene* were both cases reviewing a district court's grant of *summary judgment*.  Here, at the pleading stage, Cooperrider was required only to *plausibly allege* that his speech was a motivating factor of the enforcement action.  He does so.  Whether or not the action would have been taken in the absence of Cooperrider's speech is a quintessential fact question to be inquired into during the discovery process.

[14]With respect to this allegation, which goes to Appellees' state of mind in deciding to initiate and continue the enforcement action against Brewed, we have noted that "[a] defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 545 (6th Cir. 2012) (quoting *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir. 2010)).

witnesses have confirmed" that all Defendants "had knowledge of the existence of Brewed's [new and compliant public safety] plan, and deliberately chose to continue their illegal enforcement action," *id.* at ¶ 33 (Page ID #8); that "Beshear, Perry, and Duke each directed that no . . . settlement be offered to Brewed, because the Defendants desired to punish Brewed and Cooperrider for their First Amendment protected speech," *id.* at ¶ 34 (Page ID #8–9); and that Woods and Taylor, in revoking Brewed's license, acted "in accord with directives they received from Defendants Beshear, Perry, and Duke," *id.* at ¶ 35 (Page ID #9). At this stage of the proceedings, these allegations are adequate to allow a district court "to draw the reasonable inference that the [Defendants are] liable for the misconduct alleged," that is, that Beshear, Perry, and Duke were substantially motivated to pursue alcohol license-revocation proceedings against Brewed because of Cooperrider's statements. *See Iqbal*, 556 U.S. at 678.

Defendants urge us to follow the lead of the district court, which decided the causation element largely based on the gap in time between Cooperrider's speech and the adverse action. Beshear Br. at 19; Newton Br. at 19; Duke Br. at 14. Citing our decision in *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392 (6th Cir. 2010), the district court determined that "the long duration between the Plaintiffs' speech and the Defendants' actions is a weak indicator, if any, of causation." R. 26 (Mem. Op. and Order I at 17) (Page ID #425); *see Vereecke*, 609 F.3d at 400 ("[T]he more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with 'other evidence of retaliatory conduct to establish causality.'" (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524–25 (6th Cir. 2008))). But *Vereecke*, like the rest of the cases the district court cited in support of its conclusion,[15] was decided at the summary-judgment stage. Here, at the pleading stage, Cooperrider need only "allege[] facts 'that would allow a jury to find that [the adverse action] was motivated at least in part by' [Cooperrider's] speech." *Bright v. Gallia County*, 753 F.3d 639, 653 (6th Cir. 2014) (quoting *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir. 2010)).

---

[15]The district court cited *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (upholding grant of summary judgment where the adverse action occurred two to five months after employee filed EEOC and OCRC charges) and *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022) (upholding grant of summary judgment where passage of three months between employee's complaint and his termination was a "firm indicator of a lack of a causal link").

Cooperrider alleges that he "made ongoing posts and other speech critical of the Governor and others . . . starting in November, 2020 and through March 24, 2022." Appellant Br. at 20; R. 1 (Compl. at ¶¶ 13–14) (Page ID #4). The enforcement action began on November 25, 2020. R. 1 (Compl. at ¶ 18) (Page ID #5). Cooperrider therefore claims that "mere days" passed between his protected speech and the adverse action. Appellant Br. at 20. Whether that claim is true is a question of fact inappropriate for resolution at this stage.

We conclude that the complaint succeeds in stating a First Amendment retaliation claim. In coming to the opposite conclusion, the district court, by finding that almost all of Cooperrider's factual allegations were "conclusory," R. 26 (Mem. Op. and Order I at 13) (Page ID #421), fundamentally misapplied the pleading standard as articulated in *Iqbal*. That case and its progeny in this court stand for the proposition that we need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The district court applied that proposition to find that the facts alleged in the complaint "amount[ed] to nothing more than a 'formulaic recitation of the elements'" of a First Amendment retaliation claim. R. 26 (Mem. Op. and Order I at 14) (Page ID #422) (quoting *Iqbal*, 556 U.S. at 681). But the complaint contained far more than a mere recitation of the elements of Cooperrider's claim. It contained a number of factual allegations as to Defendants' knowledge of Cooperrider's highly critical speech and their decision to pursue an enforcement proceeding against Brewed in retaliation for that speech. Whether those allegations should be believed is a question of fact inappropriate for resolution at the pleading stage.[16]

Having concluded that the complaint successfully states a First Amendment retaliation claim, we next address whether the right at issue was clearly established at the time of the alleged violation. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). In the context of a motion to dismiss, "[t]he test is whether, reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly

---

[16]As we observed in *Mediacom Southeast LLC v. BellSouth Telecommunications, Inc.*, "[t]he district court's construction of Fed. R. Civ. P. 12(b)(6)—crediting the defendant's, rather than the plaintiff's version of facts—unduly raises the pleading standard beyond the heightened level of *Iqbal* and *Twombly*, forcing the plaintiff's well-pleaded facts to be not only plausible, but persuasive. That is not the appropriate burden at this stage of the litigation." 672 F.3d 396, 400 (6th Cir. 2012). Similarly, here, the district court did not uniformly construe the complaint in the light most favorable to the plaintiff in denying his First Amendment claim.

established constitutional right." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 562–63 (6th Cir. 2011). "The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional." *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994). And we have "clearly stated that private citizens have a First Amendment right to criticize public officials and to be free from retaliation for doing so." *Holzemer*, 621 F.3d at 520. We therefore conclude that the complaint plausibly alleges that Beshear, Perry, and Duke violated Cooperrider's clearly established right to criticize the state government without retaliation. Accordingly, we reverse the district court's grant of qualified immunity to Beshear, Perry, and Duke as to Cooperrider's First Amendment retaliation claim.

### b. Substantive Due Process

Cooperrider contends that Beshear, Perry, and Duke violated his substantive-due-process rights by arbitrarily depriving him of his property—i.e., Brewed's alcohol license—despite the intervening changes in Kentucky law that Cooperrider contends "completely foreclosed any of the actions taken by Appellees after June [28], 2021." Appellant Br. at 22 (emphasis omitted).[17] The district court determined that the complaint failed to state a plausible claim that the enforcement action was unconstitutionally arbitrary. R. 26 (Mem. Op. and Order I at 23) (Page ID #431). We agree.

"The Due Process Clause of the Fourteenth Amendment protects citizens from governmental deprivation of 'life, liberty, or property, without due process of law.'" *Kerchen v. Univ. of Mich.*, 100 F.4th 751, 763 (6th Cir. 2024) (quoting U.S. Const. amend. XIV, § 1). The doctrine of substantive due process commands that "governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992) (citation omitted). Among other things, substantive due process "protects individuals against deprivations based on

---

[17]Cooperrider also alleges "disparate treatment" in that DABC continued to pursue the enforcement action against Brewed while settling other, similar cases such that he was unconstitutionally treated differently than similarly situated businesses. Appellant Br. at 22 (citing *Paterek v. Village of Armada*, 801 F.3d 630 (6th Cir. 2015)). But it is the Equal Protection Clause, not the Due Process Clause, that "safeguards against the disparate treatment of similarly situated individuals as a result of government action." *Paterek*, 801 F.3d at 649. Cooperrider does not raise an equal-protection claim. We therefore disregard Cooperrider's argument as to his alleged disparate treatment.

'arbitrary and capricious' action," or, in other words, "behavior from state actors that 'shock[s] the conscience.'" *Kerchen*, 100 F.4th at 763 (first quoting *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003)) (then quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003)).

"When the conduct in question has been taken by an executive officer, the action violates substantive due process only if it can be characterized as 'arbitrary, or conscience shocking, in a constitutional sense.'" *Handy-Clay*, 695 F.3d at 547 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)). We have stated that "this characterization applies to 'only the most egregious official conduct, . . . conduct that is 'so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency.'" *Id.* at 547–48 (first quoting *Lewis*, 523 U.S. at 846) (then quoting *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957)). This standard "sets a high bar," *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014), and we have been careful to emphasize that it "does not impose constitutional liability on all state actors who simply cause harm," *Kerchen*, 100 F.4th at 763.

Here, Cooperrider's claim is that Beshear, Perry, and Duke "flagrantly ignored Kentucky state law" in continuing the enforcement action against Brewed despite the intervening passage of legislation. Appellant Br. at 23. Cooperrider plausibly pleaded the deprivation of a protectable interest under the Constitution, that is, the revocation of Brewed's alcohol license. *See R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 435 (6th Cir. 2005) (holding that a holder of a liquor license has a constitutionally protected property interest in the license). The question before us is therefore whether Beshear's, Perry's, and Duke's "alleged role[s] in this deprivation amounted to conscience-shocking behavior." *Kerchen*, 100 F.4th at 763.

Even viewing the complaint in the most favorable light, we conclude that Cooperrider fails to allege that Beshear, Perry, or Duke engaged in constitutionally arbitrary or conscience-shocking conduct. Assuming that the three directed DABC to initiate the proceeding, the decision to engage in disciplinary action against a state-licensed establishment found to be in violation of state law does not shock the conscience. And the continuation of the enforcement proceeding after the passage of HB1, HR 77, and HB192—particularly where it is unclear whether any of the legislation was retroactive—"does not sink to the level of conscience-shocking state action." *Gerber v. Herskovitz*, 14 F.4th 500, 508 (6th Cir. 2021).

"Where governmental action does not deprive a plaintiff of a particular constitutional guarantee or shock the conscience, that action survives the scythe of substantive due process so long as it is rationally related to a legitimate state interest." *Valot v. Se. Loc. Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997). At this stage of the litigation, Cooperrider "bear[s] the burden to show that Defendants' decision was not rationally related to a legitimate state interest." *Id.* He fails to carry that burden. As Beshear, Perry, and Duke all posit, Kentucky has a legitimate governmental interest in regulating the sale of alcoholic beverages within its borders. *City of Newport v. Iacobucci*, 479 U.S. 92, 96 (1986). The enforcement proceeding against Brewed was based upon two independent violations of state alcohol regulations: Brewed's disregard of the Governor's COVID-19 public-safety orders and Cooperrider's disorderly conduct. R. 23-3 (Emer. Susp. Order at 1–2) (Page ID #344–45). Defendants therefore had a rational basis for pursuing the enforcement action. Because the complaint fails to state a substantive-due-process claim, the district court correctly granted Beshear, Perry, and Duke qualified immunity as to this claim.

### c. Procedural Due Process

Finally, Cooperrider argues that he was afforded constitutionally inadequate process with respect to the deprivation of Brewed's alcohol license. Appellant Br. at 24. The district court determined the complaint failed to allege a plausible procedural-due-process claim. R. 26 (Mem. Op. and Order I at 20) (Page ID #428). We agree.

To establish a procedural-due-process claim in a § 1983 action, "plaintiffs must establish three elements: (1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment . . . , (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest." *Hahn v. Star Bank,* 190 F.3d 708, 716 (6th Cir.1999). As discussed above, Cooperrider's claim satisfies the first two prongs of this test because, in revoking Brewed's liquor license, the government deprived him of property in which he had a constitutionally protected right. *See Keego Harbor*, 397 F.3d at 435. The only question before us is whether Cooperrider was afforded adequate process prior to the deprivation.

Cooperrider does not dispute that he received notice and an opportunity to be heard prior to the revocation of Brewed's alcohol license. *See* R. 1 (Compl. at ¶ 31) (Page ID #8) (acknowledging that Cooperrider was granted a hearing in front of the DABC prior to the revocation of Brewed's license). Cooperrider nevertheless argues that he was denied adequate process because Defendants' "personal animus permeated the end decision, rendering the result [of the hearing] invalid." Appellant Br. at 24. In support of this argument, Cooperrider cites *Williams v. Pennsylvania*, a case in which the Supreme Court held that "under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." 579 U.S. 1, 8 (2016). There, the Court found a procedural-due-process violation where a state supreme court justice, who as a district attorney had given approval to seek the death penalty against an individual, failed to recuse himself and participated in the state supreme court's decision to reverse a state postconviction court's grant of relief. *Id.* at 14. In so finding, the Court pointed to its prior holdings that "an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case." *Id.* at 8 (citing *In re Murchison*, 349 U.S. 133, 136–37 (1955)).

*Williams* is materially distinguishable. Here, although the complaint alleges that Beshear, Perry, and Duke directed the enforcement action against Brewed, it fails to allege that any of the three were involved in adjudicating the proceeding. In fact, Cooperrider admits that "there are no claims asserted against the hearing officer" who adjudicated the revocation hearing. Appellant Br. at 26. And the complaint fails otherwise to allege that any adjudicatory official had "significant, personal involvement in a critical decision in [Cooperrider's] case g[iving] rise to an unacceptable risk of actual bias." *Williams*, 579 U.S. at 14.[18] The complaint therefore fails to state a plausible claim of any procedural-due-process violation. The district court properly

---

[18]To the extent that Cooperrider's procedural-due-process claim stems from the alleged personal animus of Woods and Taylor, as discussed in Part II.B.1.b, all claims against Woods and Taylor in their individual capacities are barred by the doctrine of absolute immunity.

granted qualified immunity to Beshear, Perry, and Duke as to Cooperrider's procedural-due-process claim.[19]

## C.  Claims Against Defendants in their Official Capacities

We next turn to Cooperrider's claims against Defendants in their capacities as officers of the Commonwealth of Kentucky.  Cooperrider seeks injunctive relief in the form of an order directing Defendants to cease the alleged ongoing violation of his First Amendment and due-process rights.  But in his complaint, Cooperrider identifies only one alleged ongoing violation: the continued seizure of Brewed's alcohol license.  The district court was therefore correct to dismiss Cooperrider's official-capacity First Amendment and procedural-due-process claims.

### 1.  Sovereign Immunity

The district court held that the doctrine of sovereign immunity barred Cooperrider's First Amendment and procedural-due-process claims against all Defendants in their official capacities. R. 26 (Mem. Op. and Order I at 7) (Page ID #415).  We review de novo a district court's finding that a defendant is entitled to sovereign immunity.  *Stanley v. W. Mich. Univ.*, 105 F.4th 856, 863 (6th Cir. 2024).

The Eleventh Amendment to the United States Constitution bars actions "against states unless they consent to be sued or Congress, pursuant to a valid exercise of its power, unequivocally expresses its intent to abrogate sovereign immunity." *Ashford v. Univ. of Mich.*, 89 F.4th 960, 969 (6th Cir. 2024).  That bar also applies to "state officers acting in their official capacity" and "entities acting on behalf of the state." *Id.*  And "[a]lthough the text does not explicitly say so, Eleventh Amendment immunity precludes suits brought against a State by its own citizens." *Stanley*, 105 F.4th at 863.

---

[19]In conjunction with his argument that Cooperrider fails to state either a procedural- or substantive-due-process claim, Governor Beshear argues that, even if Cooperrider had "set forth plausible due process claims," we should abstain from adjudicating Cooperrider's due-process claims under the doctrine of *Younger* abstention. Beshear Br. at 29–31 (citing *Younger v. Harris*, 401 U.S. 37 (1979)).  According to Beshear, if we were to find "error in the District Court's ruling that Appellants have not raised cognizable procedural and substantive due process claims, any such error is harmless because *Younger* abstention applies." *Id.* at 31.  But we find no error in the district court's rulings as to Cooperrider's due-process claims.  Accordingly, we need not reach this final point.

There are exceptions to the sovereign-immunity bar, including, as relevant here, the narrow exception recognized in *Ex parte Young*, 209 U.S. 123 (1908).  That exception provides that "suits against state officials seeking equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment."  *Mich. Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 867 (6th Cir. 2000).  "But the *Ex parte Young* exception applies only when a plaintiff seeks and clearly alleges 'prospective' equitable relief to stop 'a continuing violation of federal law.'"  *Josephson*, 115 F.4th at 782 (quoting *Morgan v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 515 (6th Cir. 2023)).  As a result, we "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S 261, 296 (1997)).

We agree with the district court that sovereign immunity bars Cooperrider's First Amendment retaliation and procedural-due-process claims against Beshear, Perry, Duke, Newton, Woods, and Taylor in their official capacities.  The alleged violations underlying both claims have concluded.  With respect to the First Amendment claim, Defendants "finished" retaliating against Cooperrider for his speech when they permanently revoked Brewed's alcohol license, and the complaint fails to allege any anticipated future acts of retaliation.  With respect to the procedural-due-process claim, the allegedly inadequate process of which Cooperrider complains—that is, the process afforded him prior to the revocation of Brewed's license—concluded when the license was revoked.  The complaint does not allege the ongoing violation of his First Amendment or procedural-due-process rights.

We also agree with the district court that sovereign immunity does not apply to bar Cooperrider's substantive-due-process claim.  "[S]tate officials may commit 'ongoing' violations when they unconstitutionally retain possession of a person's identifiable property."  *Mikel v. Quin*, 58 F.4th 252, 257 (6th Cir. 2023).  Here, the complaint alleges that Defendants violated Cooperrider's substantive-due-process rights by revoking Brewed's alcohol license and seeks prospective relief in the form of the reissuance of that license.  That allegation falls squarely within the *Ex parte Young* exception.

## 2. Substantive Due Process

Because Cooperrider's substantive-due-process claim falls within the *Ex parte Young* exception, the doctrine of sovereign immunity does not bar Cooperrider from pursuing injunctive relief against Defendants in their official capacities if he plausibly states a claim of the violation of his substantive-due-process rights. As discussed in Part II.B.2.b, however, the complaint fails to state adequately a substantive-due-process claim. So the district court properly dismissed Cooperrider's substantive-due-process claim against Defendants in their official capacities.

## III. CONCLUSION

The district court correctly determined that Newton, Woods, and Taylor were entitled to the protection of absolute quasi-prosecutorial and quasi-judicial immunity. It also correctly determined that Beshear, Perry, and Duke were entitled to the protection of qualified immunity for Cooperrider's due-process claims because the complaint failed to state a plausible claim of any due-process violation. And it correctly applied the doctrine of sovereign immunity to bar Cooperrider's claims against all Defendants in their official capacities. But the district court erred in determining that Cooperrider failed to state a plausible First Amendment retaliation claim and in granting qualified immunity to Beshear, Perry, and Duke on that claim.

We therefore **AFFIRM** the district court as to its dismissal of Newton, Woods, and Taylor on the basis of absolute immunity; as to its grant of qualified immunity to Beshear, Perry, and Duke on Cooperrider's procedural- and substantive-due-process claims; and as to its dismissal of Cooperrider's claims against all Defendants-Appellees in their official capacities. But we **REVERSE** the district court as to its dismissal of Beshear, Perry, and Duke on qualified-immunity grounds as to Cooperrider's First Amendment retaliation claim and **REMAND** for further consideration consistent with this opinion.

---

**CONCURRENCE / DISSENT**

---

THAPAR, Circuit Judge, concurring in part and dissenting in part.   If the First Amendment means anything, it means citizens have a right to criticize the government.   But when Andrew Cooperrider spoke out against COVID-19 restrictions, the government broke that cardinal rule.   It took away his ability to earn a living—all because it didn't like his speech.

I join much of the majority's analysis.   But I write separately because I respectfully disagree with its decision to grant absolute immunity to Taylor and Woods.

I.

The idea that the First Amendment should protect a person's right to criticize the government isn't new.   At the Founding, states ratified the Bill of Rights because they wanted to protect citizens from government persecution.   The debates about ratification prove this point. To Federalist supporters of the Constitution, there was no need to protect specific rights.   2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 337–47 (Jonathan Elliot ed., 1827) (statements of James Wilson).   Why?   The Constitution granted the government only express powers, which didn't include the ability to censor private citizens.   But Anti-Federalists disagreed.   They feared that the federal government might overreach and try to censor ideas it didn't like.   *See* David Yassky, *Eras of the First Amendment*, 91 Colum. L. Rev. 1699 (1991).   So they persuaded the Federalists to include an amendment protecting a person's ability to speak out against the federal government.   *Id.*   After all, even the Federalists agreed that people would continue to disagree.   As James Madison put it in *Federalist* No. 10, "[a]s long as the reason of man continues fallible, and he is at liberty to exercise it, different opinions will be formed."   *The Federalist* No. 10, at 73 (James Madison) (Clinton Rossiter ed., 2003).   Over the last two centuries, that ideal has guided courts' interpretation of the First Amendment.   *See* Robert Bork, *Neutral Principles and Some First Amendment Problems*, 47 Ind. L.J. 1 (1971). Explicitly political speech, as Judge Bork explained, is always protected.   *Id.* at 26.

Since the Founding, some of our nation's most regrettable moments have come when the government ignored the First Amendment's constraints. One early black mark came just a decade after states ratified the Constitution. When citizens criticized President John Adams, the Adams administration indicted Americans under the Sedition Act. Wendell Bird, *New Light on the Sedition Act of 1798: The Missing Half of the Prosecutions*, 34 L. & Hist. Rev. 541, 544 (2016). Representative Matthew Lyon was the first victim. He published two letters to newspaper editors attacking President Adams' "continual grasp for power" and his unbounded thirst for "ridiculous pomp, foolish adulation, and selfish avarice." Francis Wharton, *State Trials of the United States During the Administrations of Washington and Adams* 333 (Burt Franklin ed., 1970). Lyon's political speech resulted in a political prosecution and a conviction. While Lyon and his compatriots lost the battle against censorship, they soon won the war. The indictments enraged legislators throughout the young country, inspired the Kentucky and Virginia Resolutions, and sparked a groundswell of support for free speech. And the American people ousted President Adams and relegated the Sedition Act to the dustbin of history. *See* Frank Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905, 907 (1989) (discussing President Jefferson's subsequent pardons for all individuals convicted under Alien and Sedition Acts).

Another shameful moment came as America barreled towards civil war. Taking a page from the Adams administration, authorities in the South prosecuted individuals who criticized slavery. In one such incident, North Carolina convicted Reverend Daniel Worth for circulating a book that spoke out against slaveowners. *Case of Rev. Daniel Worth*, N.Y. Times, Apr. 5, 1860, https://www.nytimes.com/1860/04/05/archives/case-of-rev-daniel-worth-conviction-and-sentence-of-imprisonment.html. The Reverend faced imprisonment for his speech. Michael Kent Curtis, *The 1859 Crisis over Hinton Helper's Book, the Impending Crisis: Free Speech, Slavery, and Some Light on the Meaning of the First Section of the Fourteenth Amendment*, 68 Chi.-Kent L. Rev. 1113, 1159 (1993). Although a North Carolina jury found Worth guilty, history vindicated his cause. Slavery and suppressing speech went together. As Frederick Douglass observed, "Slavery cannot tolerate free speech." Frederick Douglass, "A Plea for Freedom of Speech in Boston," Dec. 9, 1860. Persecuting people who spoke out against slavery was wrong then, and in history's cold light, appears even more abhorrent now.

All in all, American history shows that those who suppress critical speech are often on the wrong side of the Constitution. It's easy to think that we would never repeat yesterday's sins today. Perhaps because it seemed so far-fetched, for much of the last century, government censorship was relegated to law-school hypotheticals. For example, then-Associate Justice William Rehnquist once hypothesized what would happen if the government tried to crack down on reports related to a spreading pandemic. William H. Rehnquist, *The First Amendment: Freedom, Philosophy, and the Law*, 12 Gonz. L. Rev. 1, 15–17 (1976). While he wasn't sure how courts would rule, he explained such repression would be "stark and dramatic," and was thankful courts hadn't had to confront such an issue. *Id.* at 17. Justice Rehnquist figured that the government's "real motive" would be to cover up its own mistakes and repress those who pointed them out. *Id.*

II.

Enter Andrew Cooperrider. As the majority notes, Cooperrider owns Deans Diner, LLC, which does business as "Brewed." Brewed is a small business that sells coffee and beer. It's a place where people come together to talk, drink, and enjoy one another's company.

So when Kentucky Governor Andy Beshear issued executive orders that forced businesses to close during COVID, Brewed and Cooperrider were hit hard. Cooperrider couldn't serve his patrons. And with no patrons, Cooperrider couldn't earn a living. For many white-collar workers, Governor Beshear's COVID restrictions offered an opportunity to fire up Zoom and work from home. For Cooperrider, like so many other small business owners and blue-collar workers, those restrictions threatened his ability to earn a living.

Cooperrider took to social media to criticize the government's policies. He didn't like that the Commonwealth of Kentucky shut down businesses, sent police officers into churches to block Easter Sunday celebrations, and silenced protestors. In his view, COVID didn't warrant closing restaurants and shuttering bars. He criticized many state officials for saying otherwise. His civic involvement was deep and passionate. He even tried to institute a citizen campaign against the governor.

According to Cooperrider, the state government didn't appreciate his dissenting views. So Kentucky sought to strip Cooperrider's alcohol license because he allegedly hadn't complied with executive orders prohibiting indoor dining during COVID. Cooperrider alleges that the government not only knew about his comments but came after him and his livelihood because of them. And he says that although the government settled similar disagreements over COVID restriction compliance with other individuals, it refused to settle with him because of his critical comments. Ultimately, even though the initial hearing officer didn't recommend revoking Cooperrider's license, the Kentucky Department of Alcoholic Beverage Control disagreed. Kentucky stripped Cooperrider and Brewed of the ability to serve alcohol.

### III.

Despite the persecution Cooperrider faced, the majority relies on a theory of absolute immunity to find that Cooperrider can't hold two state executive officials responsible for their actions. But the majority's wrong to do so: Absolute immunity applies to judicial, not executive officials.

### A.

Absolute judicial immunity is strong but necessary medicine. Indeed, for more than a century, American courts have recognized that the need to protect "judicial independence" and reduce "vexatious litigation" about judges' motives can merit a break from the general principle that each man is liable for his own wrongdoing. Judicial immunity is "as old as the law, and its maintenance is essential to the impartial administration of justice." *Randall v. Brigham*, 74 U.S. (7 Wall.) 523, 536 (1869). It's important because such immunity prevents litigation about judges' motives, preserves "judicial independence," and avoids "vexatious litigation." *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 348, 354 (1872). Thus, for generations, courts have found that judicial immunity applied to only judges and those acting as judges in courts, like officers conducting courts-martial. *See* Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337, 1357–58 (2021). It's true that executive officers had other immunities. *See id*. at 1358. But judicial immunity is a stiff tonic for a particular ill—not one that courts lightly apply to people outside the judiciary.

Here, though, the majority opinion takes a different approach. In sizing up the actions of two executive officials in Kentucky's Department of Alcoholic Beverage Control (Taylor and Woods)—who aren't judges—the majority reasons that both officials should receive "quasi-judicial" immunity.

The majority's reasoning suggests that any official, from any branch of government, could enjoy judicial immunity if he looks enough like a judge.[1] But that's not how American law treats executive officers or defines judicial immunity.

B.

The Supreme Court has set out a multi-factor test to determine whether individuals deserve absolute immunity. A court is supposed to probe several elements, including: (a) the need to ensure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions to control unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal. *Butz v. Economou*, 438 U.S. 478, 512 (1978); *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985). All told, the Court has explained that these factors help us assess how similar the relevant actor is to a judge—and whether he should enjoy absolute immunity. *Cleavinger*, 474 U.S. at 202.

Like many balancing tests, courts applying *Butz* and *Cleavinger* consider both the number of factors supporting a particular side and make a holistic evaluation of a party's situation. *See, e.g.*, *Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, 597 F. App'x 342, 352 (6th Cir. 2015).

---

[1]Contrary to the majority's view, our precedent doesn't demand we regularly extend absolute immunity outside the judiciary. Maj. Op. at 11 n.5. The Supreme Court has explained that it has been "quite sparing in [its] recognition of absolute immunity," and has declined "to extend it any further than its justification would warrant." *Burns v. Reed*, 500 U.S. 478, 487 (1991) (citations omitted). While there's no doubt our caselaw has at times recognized quasi-judicial immunity, the mere fact that we've said some officials deserve quasi-judicial immunity in the past doesn't mean we need to say these actors do, too. Instead, we should follow the Court's guidance: officials who seek "absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz v. Economou*, 438 U.S. 478, 506 (1978). Judicial immunity is the exception, not the rule, and requires a strong showing from the parties claiming judge-like protections. *Burns*, 500 U.S. at 487. Applying those principles, courts must be careful before extending such immunity.

Here, the factors indicate that neither Woods nor Taylor deserves absolute judicial immunity.

1.

Understanding why requires a brief overview of the state agency and proceedings at issue.  Woods and Taylor are executive officials in Kentucky's Department of Alcoholic Beverage Control.  At the time, Woods was the malt beverage administrator and Taylor was (and still is) the Commissioner, which means they're two of the three members on the Department's three-member board.  (The third member, the distilled spirits administrator, isn't at issue.)

As board members, Woods and Taylor wield significant powers.  Relevant here, they can revoke alcohol licenses for licensees who violate state statutes or regulations.  These violations include selling illegal beverages on licensed premises, making false statements in a license application, failing to pay license fees, being convicted of a felony or a misdemeanor attributable to the use of intoxicating beverages, not paying excise taxes, operating or permitting the operation of gambling on licensed premises, or selling drugs on licensed premises.  Ky. Rev. Stat. Ann. § 243.500.

When revoking a license, the board must give the licensee a statement of the causes for its proposed revocation.  *Id.* § 243.520.  The board can revoke a license only after a hearing is held in accordance with Kentucky's general rules for agency hearings.  *See id.* § 13B.125.  Once an order of revocation is final, the Board must give notice to the licensee and owner of the licensed premises.  *Id.* § 243.530.  Then, the licensee must turn over his license.  *Id.*

How do Woods and Taylor fit into this case?  Together, they issued the final order revoking Cooperrider's license.  And Taylor issued the emergency suspension order that originally deprived Cooperrider of his alcohol license.

2.

Woods and Taylor don't merit judicial immunity.  Why?  Three out of six *Cleavinger* factors cut in Cooperrider's favor.  A fourth arguably does as well.  All told, Woods and Taylor serve as prosecutor and decisionmaker, aren't safe from political influence, and don't follow

precedent. Thus, both by counting factors and through a holistic analysis, these individuals aren't much like judges at all.

Start with the first factor. Courts assess the need to ensure that the individual can perform his functions without harassment or intimidation. *Cleavinger*, 474 U.S. at 202. Here, there's no dispute that state officials making alcohol licensing decisions should be able to do their jobs without facing harassment. They decide cases that "are every bit as fractious as those which come to court." *Butz*, 438 U.S. at 513. So the first factor cuts against Cooperrider.

Next, consider the second factor, the presence of safeguards that reduce the need for private damages to control unconstitutional conduct. Here, there are some safeguards. There's a right to discovery, to compel witnesses, and to conduct cross-examination. *See generally* Ky. Rev. Stat. Ann. § 13B.080. That's significant. But, just as in *Cleavinger*, board members like Woods and Taylor are "not truly independent." 474 U.S. at 206. Why? The board, the same body responsible for prosecuting violations of state laws and regulations, decides whether those alleged violations have actually taken place. In other words, the board serves as both prosecutor and decisionmaker. And, as in *Cleavinger*, that means the "members [have] no identification with the judicial process of the kind and depth that has occasioned absolute immunity." *Id.* Thus, this factor tilts towards Cooperrider.[2]

So does the third prong. Here, the question is whether Woods and Taylor have "insulation from political influence." *Id.* at 202. Courts analyzing whether someone is insulated from political influence apply a functional approach. *See, e.g.*, *Williams v. City of Montgomery*, 742 F.2d 586, 589 (11th Cir. 1984). They look at whether the individuals are appointed, who makes the appointments, and whether the appointees serve for a defined period or at the pleasure of a political actor. *See id.* Here, the governor appoints the board members. Ky. Rev. Stat. Ann. § 241.015. What's more, the beverage administrator and commissioner serve at the governor's pleasure and can be removed without cause.[3] *Id.* § 63.080. And the beverage administrator

---

[2]While the majority asserts that a "multitude" of safeguards protect litigants, Maj. Op. at 16 n.10, the fact that a political appointee can override a neutral decisionmaker who tried to use those safeguards indicates the protections don't count for much.

[3]In addition, Cooperrider alleges that the governor can reverse board determinations.

serves at the commissioner's pleasure.  They lack the same safeguards against political influence *Cleavinger* prioritized.  As in *Cleavinger*, the board isn't a "neutral and detached" hearing body because it's made up of individuals appointed and removable at will by the governor.  474 U.S. at 203 (citation omitted).  What's more, Cooperrider alleges that the board overrode the hearing officer, and neither Woods nor Taylor have rebutted that point on appeal or provided transcripts from the hearing itself.  Thus, taking Cooperrider's allegation at face value, the license revocation process here wasn't free of politics.

The fourth prong also favors Cooperrider.  *See id.* at 202.  In *Butz*, the Court explained that precedent is one feature of the judicial process that "tend[s] to enhance the reliability of information and impartiality of the decisionmaking process."  438 U.S. at 512.  In Kentucky, the Department conducts revocation proceedings "in accordance with KRS Chapter 13B."  Ky. Rev. Stat. Ann. § 241.060(6).  Chapter 13B, in turn, does not mention precedent as a relevant rule of decision.  What's more, precedent played no role in the proceedings here.  Thus, unlike when precedent is vital to underlying proceedings, the dispute here lacked a key "check[] on malicious action" by the board members.  *Butz*, 438 U.S. at 512.

The fifth prong cuts against Cooperrider.  Here, courts look at whether the administrative process is adversarial.  *Cleavinger*, 474 U.S. at 202.  This one is.  Why?  Because an individual's right to notice, chance to respond and present testimony, cross-examine witnesses, and so on, are all indicators of adversariness.  *Id.* at 206.  And here, Cooperrider had the chance to do all those things.  Thus, the process was adversarial.

Finally, courts consider whether any error was correctable on appeal.  Cooperrider's case presents a close call on this prong.  While some judicial review of the board's decision is available, it is "confined to the record" absent fraud or misconduct.  Ky. Rev. Stat. Ann. § 13B.150.  Thus, claims of bias, conflict of interest, and prejudice can't be examined by a reviewing court unless they're in the record made before the board.  And while our court has noted in other cases that the availability of judicial review is material, the court's review there wasn't "confined to the record."  *See Flying Dog Brewery*, 597 F. App'x at 352.  Or the process in question had considerable procedural protections within the administrative agencies themselves, such as a board comprised of independent decisionmakers.  *See Hughes v. Duncan*,

93 F.4th 374, 380 (6th Cir. 2024). Those protections are absent here. All told, this factor is a close call, but tilts towards Cooperrider.

On balance, three of the *Butz* and *Cleavinger* factors favor Cooperrider, two cut against him, and one is a close call. In such a circumstance, we "call this close question in favor" of Cooperrider. *Flying Dog*, 597 F. App'x at 352.

3.

Rather than apply *Cleavinger*, the majority turns to *Watts v. Burkhart*. 978 F.2d 269 (6th Cir. 1992) (en banc).[4] But *Watts* is not to the contrary. There, our en banc court considered whether quasi-judicial absolute immunity protected members of a state medical licensing board that revoked a physician's license. We conducted an exhaustive survey of caselaw about quasi-judicial immunity dating to 1771. *Id.* at 272. And, applying *Cleavinger*'s factors, we concluded that the medical board consisted of "independent professionals" who are "at least as independent, one would assume, as state judges." *Id.* at 276. Thus, absolute immunity protected the medical licensing board.

*Watts* involves a different state, different board, and different rules. In each case, we must conduct the *Cleavinger* analysis anew. Two of Watts' factors are relevant here. Start with the first factor, which *Watts* said required looking at whether someone is "akin to" a judge. *Id.* at 278. The administrators here don't look much like judges. In the past, courts have reserved that label for officials who have removal protections, serve fixed terms, and aren't employees of a party to the case. *See, e.g.*, *Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1422 (6th Cir. 1996). Here, both Taylor and Woods are state employees—subordinate to the governor. They don't have removal protections and don't serve fixed terms. Thus, they don't look much like judges at all. What's more, merely focusing on the power to sit at the helm of administrative hearings

---

[4]While the majority views *Watts* as applying a hard-and-fast test, *see* Maj. Op. at 13 n.6, *Watts* just applied the test laid out in *Cleavinger*. After all, as an intermediate appellate court, the *Watts* court couldn't have departed from Supreme Court precedent. *Agostini v. Felton*, 521 U.S. 203, 207 (1997). Nor did *Watts* purport to do that. Instead, after analyzing and applying *Cleavinger*, it merely remarked in passing on a test the First Circuit set out in *Bettencourt v. Bd. of Registration In Med. of Com. of Mass.*, 904 F.2d 772 (1st Cir. 1990), which it viewed as consistent with *Cleavinger*. *Watts*, 978 F.2d at 278. And, at bottom, this court can't depart from the Supreme Court's clear direction that we should apply *Cleavinger*.

risks expanding absolute immunity's strong medicine. And at a minimum, courts should not extend absolute immunity to state officials in the absence of "the most convincing showing that the immunity is necessary." *Imbler v. Pachtman*, 424 U.S. 409, 434 (1983) (White, J., concurring in judgment). Taylor and Woods haven't made that showing.[5]

*Watts*'s third prong also cuts towards Cooperrider, although it remains a close call. The majority says "a number of" regulatory safeguards protect individuals subjected to Kentucky's proceedings. Maj. Op. at 14. These include notice and a right to legal counsel, among others. *See* Ky. Rev. Stat. §§ 13B.020(1), 13B.050(3)(f), 13B.080(4), 13B.090(1), 13B.110(1)–(4), 13B.120(3). These are real procedural safeguards. But here, Taylor and Woods aren't neutral hearing officers. Woods, after all, reports to Taylor, and both report to the governor. There's no "structure insuring the adjudicator's independent judgment on the evidence, free from outside influences." *Joseph v. Patterson*, 795 F.2d 549, 558 (6th Cir. 1986), *abrogated on other grounds by Kalina v. Fletcher*, 522 U.S. 118 (1997). A litany of procedural safeguards related to a hearing don't mean much if the hearing doesn't affect the decision. Thus, the majority is wrong to focus on a "careful, multi-level procedural structure." Maj. Op. at 16 n.8.

Taken together, a close look at Kentucky's procedures suggests that, even under the majority's reading of *Watts*, Cooperrider has shown the officials shouldn't get absolute immunity.

4.

Taylor and Woods claim that since they're also partly prosecutors, they are entitled to the absolute immunity our court normally affords to prosecutors. But Taylor and Woods are not entitled to that immunity either. While there's little doubt that prosecutors can enjoy absolute immunity if they're responsible for initiating prosecution, that immunity applies only if their

---

[5]In response, the majority attempts to differentiate between whether an official "seems" like a judge or "act[s]" like a judge. Maj. Op. at 14 n.7. However, the relevant test is whether, applying *Cleavinger*, a particular official measures up. Here, because these officials are appointed by the governor, are removable, and don't have set terms, they fail the *Cleavinger* test. *Hughes v. Duncan* is not to the contrary. 93 F.4th 374, 381 (6th Cir. 2024). There, this court considered and explained that the Tennessee parole board was "comprised of seven members serving six-year terms. Although the members are appointed by the governor, the Board is 'autonomous in structure.'" *Id.* at 380 (quotation omitted). Here, the board is not comprised of members serving terms for a definite number of years, and while they may serve up to four years, they are removable at will.

"decision to proceed with a case is subject to scrutiny in the proceeding itself." *Butz*, 438 U.S. at 516. As the Supreme Court outlined in *Butz,* a respondent needs the chance to "present his evidence to an impartial trier of fact and obtain an independent judgment as to whether the prosecution is justified." *Id.* But that didn't happen here, since Taylor and Woods were also the final deciders as to whether Cooperrider could keep his alcohol license. Taylor and Woods served as judge, jury, and enforcer. That combination of executive and judicial functions is concerning, to say the least. *Cf. The Federalist* No. 47, at 298 (James Madison) (Clinton Rossiter ed., 2003). To cloak its exercise with absolute immunity would be alarming.

## IV.

Besides its ruling on absolute immunity, I join the majority opinion. The majority correctly follows Supreme Court precedent in (1) holding that the district court erred in finding that the defendants deserved qualified immunity and (2) finding that Cooperrider didn't plausibly plead a substantive due process violation under Supreme Court precedent. I write separately to emphasize several points.

## A.

First, qualified immunity. Qualified immunity is less potent than absolute immunity. It doesn't protect officials from suits seeking injunctive relief, and even when it does apply, it shields defendants from liability for monetary damages only if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Clearly established" means that the law is so clear at the time of an incident that every reasonable officer would understand that his conduct broke the law. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). While qualified immunity isn't quite as robust as the absolute variety, it's still potent.

## 1.

I agree with the majority that the defendants do not enjoy qualified immunity. But I disagree with the idea that timing has anything to do with the decision. While the majority correctly holds that the district court erred in finding that the defendants deserved qualified

immunity, it's important to remember that courts have the power to evaluate qualified immunity claims at the motion to dismiss stage.

In recent years, the timing of qualified immunity determinations has generated considerable confusion. On the one hand, judges have explained that an officer's "entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point." *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003). And we've said the motion to dismiss stage is just such a moment. *Brown v. Giles*, 95 F.4th 436, 441 (6th Cir. 2024). On the other hand, other judges have reasoned that the appropriate point is "usually summary judgment and not dismissal." *See Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015). The majority falls into this latter camp, asserting that it's inappropriate to make such a determination at the motion to dismiss stage.

But that's incorrect. How so? Qualified immunity isn't a factual question. Instead, at the motion to dismiss stage, a court should accept the facts in the plaintiff's complaint as true and consider whether the defendant violated clearly established constitutional rights. *See Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 626 (6th Cir. 2019); *Marvaso v. Sanchez*, 971 F.3d 599, 614 (6th Cir. 2020) (Nalbandian, J., dissenting). That's a classic legal issue, which is why courts can review it on an interlocutory appeal. *See, e.g.*, *Johnson v. Jones*, 515 U.S. 304, 317 (1995). Thus, the mere fact that a pleading sits at the motion to dismiss stage doesn't mean this court can't resolve a qualified immunity defense. It can—and often should.

## B.

Finally, Cooperrider's substantive due process claim. After the majority applied the doctrines of absolute, qualified, and sovereign immunity, it determined Cooperrider had only one claim left: his argument that the defendants ignored state law and deprived him of a protectable liberty interest in violation of the Constitution when they took away his alcohol license. This claim survived this far because qualified immunity only shields the defendants from monetary damages, and Cooperrider seeks injunctive relief on this front. *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001).

The majority was correct to conclude that Cooperrider's substantive due process claims fall short. Why? He failed to plead a claim that the enforcement scheme was unconstitutionally arbitrary or conscience-shocking.

I agree that Cooperrider failed to state a claim on which relief could be granted, but write separately to emphasize that substantive due process is a judge-made doctrine that, if used at all, should apply only to rights well-grounded in American history and tradition.

Substantive due process, of course, is an oxymoron. Leave it to lawyers to figure that a constitutional provision regulating the *process* by which substantive rights can be infringed places *substantive* constraints on government. As John Hart Ely famously remarked, substantive due process is "a contradiction in terms—sort of like 'green pastel redness.'" John Hart Ely, *Democracy and Distrust* 18 (1980). Yet according to the judge-made doctrine of substantive due process, some government conduct is illegal regardless of whether the Fifth or Fourteenth Amendment's procedural guarantees were violated. *Washington v. Glucksberg*, 521 U.S. 702 (1997). Although the Supreme Court has found that plaintiffs may bring claims based on violations of their supposed substantive due process rights, any deviation from the Constitution's text should be minimal. That's why any substantive due process right must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Id.* (citations omitted). Asserted "rights" that fail this test—much less those that are "entirely unknown in American law"—don't pass muster. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022). A claim's "novelty" provides "reason enough to doubt that 'substantive due process' sustains it." *Reno v. Flores*, 507 U.S. 292, 303 (1993). The *Glucksberg* framework provides a key limiting principle for an atextual doctrine that's not grounded in law. *Cf. L. W. by & through Williams v. Skrmetti*, 73 F.4th 408, 416 (6th Cir. 2023).

V.

During the coronavirus pandemic, Americans turned to their national, state, and local governments for help. We "sought answers less from ourselves, our friends, and our neighbors and more from central authorities." Neil Gorsuch & Janie Nitze, *How Covid-19 Restrictions*

*Created Winners and Losers*, National Review, https://www.nationalreview.com/2024/08/how-covid-era-government-restrictions-damaged-the-rule-of-law/.

While fifteen days to slow the spread sounded harmless enough, for Cooperrider, the resulting months-long lockdowns were anything but. Federal and state officials forced millions of Americans to forgo the things that make life healthy, happy, and fulfilling—like going to coffeeshops and bars. In doing so, the lockdowns caused mental health disorders,[6] increased speech delays in children,[7] and led to a dramatic rise in chronic conditions that, combined with non-COVID factors, killed more Americans under the age of 45 than the virus.[8]

On the economic front, the government's response to COVID harmed people like Mr. Cooperrider. While white-collar folks could work from the comfort of their living room, service workers and others were forced to stay home, and thus, effectively laid off.[9] Understandably frustrated with the inequity and what he believed were the government's disastrous policies, Cooperrider spoke out. And if the government retaliated against him for it, he should have his day in court.

\*　　\*　　\*

With these caveats, I respectfully concur in the majority's opinion except as to its analysis of whether Woods and Taylor enjoy absolute immunity.

---

[6]Ibtihal Ferwana & Lav R. Varshney, *The Impact of COVID-19 Lockdowns on Mental Health Patient Populations in the United States*, Nature (Mar. 7, 2024).

[7]*Poll Shows Increase in Hearing, Speech, and Language Referrals, More Communication Challenges in Young Children*, ASHA (Apr. 30, 2023).

[8]Staff of H. Comm. On Oversight, 118th Cong., Rep. on After Action Review of the COVID-19 Pandemic: The Lessons Learned and a Path Forward 218 (2024).

[9]Charles Bliam & Joel Kotkin, *The Virus's Uneven Path*, City Journal (May 29, 2020), available at https://www.city-journal.org/article/the-viruss-uneven-path.